IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE JOHN A. MENDEZ, JUDGE

---oOo---

ESTATE OF BALJIT SINGH, et
al.,

          Plaintiffs,

                       No. Civ. S-09-1439

vs.

COUNTY OF SACRAMENTO, et
al.,

          Defendants.

_____/

---oOo---

REPORTER'S TRANSCRIPT

EVIDENTIARY HEARING

MONDAY, APRIL 8, 2013

---oOo---

Reported by:       KELLY O'HALLORAN, CSR #6660

APPEARANCES


For the Plaintiff:


     LAW OFFICE OF STEWART KATZ
     555 University Avenue, Suite 270
     Sacramento, CA  95825
     BY:  STEWART KATZ

     LAW OFFICES OF JOSEPH C. GEORGE, Ph.D.
     601 University Avenue, Suite 200
     Sacramento, CA  95825
     BY:  JOSEPH C. GEORGE, Ph.D.
          JOSEPH C. GEORGE, JR.

For the Defendant:


     WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
     400 Capitol Mall, Twenty-Second Floor
     Sacramento, CA  94814
     BY:  ROBERT F. TYLER
          STEVEN J. WILLIAMSON

<u>INDEX</u>

<u>PLAINTIFF WITNESSES:</u>                                          <u>PAGE:</u>

LYNN MICHAEL TOMPKINS

DIRECT EXAMINATION BY MR. KATZ                          31
CROSS-EXAMINATION BY MR. TYLER                          67
FURTHER CROSS-EXAMINATION BY MR. TYLER                  69


PAUL EDWARD HENDRICKS
                                                        73
DIRECT EXAMINATION BY MR. KATZ


GREGORY SOKOLOV

DIRECT EXAMINATION BY MR. GEORGE JR.                    93
DIRECT EXAMINATION, (Cont'd.) BY MR. GEORGE JR.         106
CROSS-EXAMINATION BY MR. TYLER                          123
REDIRECT EXAMINATION BY MR. KATZ                        140

DEFENSE EXHIBITS RECEIVED IN EVIDENCE

| NO.: | DESCRIPTION: | PAGE: |
|------|--------------|-------|
| 1 | Original JPS file | 6 |
| 2 | Demographic Information | 33 |

1                    SACRAMENTO, CALIFORNIA

2                MONDAY, APRIL 8, 2013, 9:00 A.M.

3                         ---oOo---

4          THE CLERK:  Civil S-09-1439; Singh, et al. versus

5    Sacramento County, et al.

6          Counsel state their appearances, please.

7          MR. KATZ:  Yes, your Honor.  Stewart Katz, Joseph

8    George, and Joseph George, Jr., all present for the

9    plaintiffs.

10         MR. TYLER:  Good morning, your Honor.  Robert Tyler

11   and Steven Williamson for defendants.

12         THE COURT:  All right.  Good morning to you all.  This

13   is the first day of trial.  Based on a conference call on

14   Friday, we will not call the jury in this morning and will

15   deal with a number of pretrial matters that have arisen as a

16   result of some recently discovered documents that Mr. Tyler

17   turned over to Mr. Katz.

18         Mr. Tyler, I did receive by email documents that we

19   discussed during the conference call on Friday.  And then

20   there's this document which is Bates stamped JP 30000 to

21   JP 30105.  And I assume that's the original file.

22         MR. TYLER:  It is, your Honor.

23         THE COURT:  Okay.

24         MR. TYLER:  You told me to take possession of it, and

25   I did.

1          THE COURT:  Mr. Katz, did you get 30000 to 30105?

2          MR. KATZ:  I did receive those pages.  What I didn't

3    receive, and I was hoping we would at least see today, is the

4    actual file itself as opposed to --

5          THE COURT:  And it's there.  So have you had a chance

6    to look at that?

7          MR. KATZ:  I have not had a chance to look at the

8    actual file itself.

9          THE COURT:  Do you want to take ten minutes and look

10   at it?

11         MR. KATZ:  I would.

12         THE COURT:  I've got a lot to do.  So if you want to

13   take ten minutes, we can do that.  Okay.  Then we'll go off

14   the record, and then I'll come back out.  There are other

15   things I want to look at.  And we'll go back on the record in

16   about ten minutes.

17         Hang on.  Are there any other documents that you

18   brought with you today, Mr. Tyler?

19         MR. TYLER:  No.

20         THE COURT:  That's it?

21         MR. TYLER:  Yeah.  We looked.

22         THE COURT:  Okay.  All right.

23         (Recess taken.)

24         THE COURT:  All right.  Back on the record.  The Court

25   does have the original file that Mr. Tyler produced.

1          Mr. Tyler, how did you determine the Bates stamp?

2     Because there's a left and a right side of the file.

3          MR. TYLER:  Oh, I'm sorry.  I just had them start and

4     take the entire -- I had them take the file to De Necochea, I

5     guess it is, I told them to copy everything, including the

6     covers, including the tabs on the inside.  And we

7     unilaterally made an executive decision that we would start

8     at 3, whatever it is, 30000.

9          THE COURT:  Okay.

10         MR. TYLER:  That's for better or worse.

11         MR. WILLIAMSON:  Your Honor, if I could add, I was the

12    one who walked the file over to the copying service.  I asked

13    them to copy the covers of the file and then start on the

14    left side of the file, drill down through that, and then the

15    top of the right side and down through there.

16         THE COURT:  All right.  Mr. Katz, this, in theory, was

17    the file that you subpoenaed long before the litigation

18    started; right?

19         MR. KATZ:  I requested a copy, your Honor, with an

20    authorization, yes.

21         THE COURT:  And this was the file that you were

22    focusing on.  This is the JPS file.

23         MR. KATZ:  Yes.

24         THE COURT:  Okay.  And out of these -- let's see, if

25    my math is right, there's 105 pages; right?

1              MR. TYLER:  I think that's right.

2              MR. KATZ:  Correct.

3              THE COURT:  How many pages did you get in response to

4      the original subpoena?

5              MR. KATZ:  What I received, all of which I produced in

6      my Rule 26, were -- my math may not be too much better than

7      the Court's, possibly worse -- 50 or 51 pages which were

8      Bates stamped consecutively between 1415 and 1465.

9              THE COURT:  Okay.  And did you make that a trial

10     exhibit?

11             MR. KATZ:  Yes.

12             THE COURT:  Okay.  What trial exhibit is it?

13             MR. KATZ:  That would be --

14             THE COURT:  And do I have a copy of it?

15             MR. KATZ:  You do.

16             THE COURT:  Okay.

17             MR. KATZ:  That would be Plaintiff's -- I believe it

18     is Exhibit Number 8.

19             THE COURT:  Mr. Vine, can you get me Exhibit Number 8.

20             MR. KATZ:  We have the white binders.

21             THE COURT:  Okay.  And you Bates stamped yours, again,

22     JP -- is that your Bates stamp, the JP 20001 to JP 20054?

23             MR. KATZ:  No.  That would be the defendants' Bates

24     stamp, your Honor.

25             THE COURT:  Okay.  But this is the entire file that

1   you got in response to your subpoena.

2              MR. KATZ:  I believe so.  51 pages, or 50 pages.

3              THE COURT:  53.

4              MR. KATZ:  53.

5              THE COURT:  Yeah.

6              MR. TYLER:  That's actually what we produced.

7              THE COURT:  Yeah, that's probably what you produced.

8              MR. TYLER:  That's what I produced in the Rule 26.

9              THE COURT:  That's different.  I'm asking what you

10  got.

11             MR. KATZ:  I can show the Court.  I have a copy of

12  what I received which we used as our Rule 26.

13             THE COURT:  Okay.  And you Bates stamped that what?

14             MR. KATZ:  I Bates stamped those pages 1415

15  consecutively through 1465.

16             THE COURT:  Okay.

17             MR. TYLER:  And that's correct, your Honor.

18             THE COURT:  So, Mr. Tyler, you got that as part of the

19  Rule 26 disclosures?

20             MR. TYLER:  I did.

21             THE COURT:  But --

22             MR. TYLER:  Way back when.  I forget the date.

23             THE COURT:  Mr. Katz, can I have that?

24             MR. KATZ:  Certainly.

25             THE COURT:  Okay.  Because now I have three different

1    versions of this folder.  I have what Mr. Katz got in

2    response to the subpoena which is Bates stamped 1415 through

3    1465.  I have Exhibit 8 which was produced by the defendants

4    as part of the Rule 26 disclosures, and that's Bates stamped

5    JP 20001 to 20054.  And now I have the original file.

6              MR. TYLER:  Yes.

7              THE COURT:  Okay.  Which, by the way, Mr. Vine, since

8    we need to make a record, let's mark this original file as

9    Court Exhibit 1.

10                           (COURT EXHIBIT 1, Original JPS file,

11                            MARKED FOR IDENTIFICATION.)

12             MR. TYLER:  I would note, your Honor, that I found all

13   of this somewhat perplexing, and I went back and compared all

14   three back and forth.

15             THE COURT:  That was my next question.

16             Have you had a chance to do that, Mr. Katz?

17             MR. KATZ:  I believe we have now, yes.

18             THE COURT:  Okay.  So the JPS original file will be

19   Court Exhibit 1.

20             MR. KATZ:  And if I could note for the Court, my

21   objection is when that file was reassembled for you, it seems

22   to me as though they put the right side of the file out of

23   order and that the left side is from the most current going

24   backwards.  And the way the file is now constituted, that's

25   no longer the case.

1          MR. TYLER:  We did not -- I took possession of the

2     file.  We did not have to reassemble it or anything.  What

3     you have is what --

4          THE COURT:  Is the way you got it?

5          MR. TYLER:  Is the way I got it and is the way that it

6     was sitting in the file cabinet when I went over to the JPS

7     offices on early Friday afternoon.

8          THE COURT:  Say that one more time, Mr. Katz.

9          MR. KATZ:  Certainly.  The way the left side of the

10    file is, there's sort of an entry/admissions slip on top, and

11    then the most recent periods of incarceration are separated

12    by a divider on top.  That's not the case on the right-hand

13    side of the file.

14         THE COURT:  Okay.  So there's obviously roughly --

15    let's not guess here, about 55 pages that you didn't receive

16    originally.  It seems you got one or two additional pages.

17    There's a difference of only one or two pages between the

18    defendants' Rule 26 disclosure and your Rule 26 disclosure.

19    You produced 54 pages and Mr. Katz Bates stamped 50 pages.

20         MR. TYLER:  And I finally figured out what -- I found

21    two pages that were additional or different, if you want.  If

22    you look at Exhibit 8, or Defendant's A, JP 20009 is what we

23    call an MAR or an administration record of medications that

24    were actually given to Mr. Singh during a prior -- in 2004.

25    And actually that would be -- well, anyway.  And so that was

1   not produced to plaintiffs under their original subpoena.

2           THE COURT:  Okay.

3           MR. TYLER:  And then another page discrepancy appears

4   at 20012.  I have a blank page.  So there's just a --

5           THE COURT:  Okay.

6           MR. TYLER:  I couldn't, for the life of me, and maybe

7   I could find it if I looked, I spent the better part of an

8   hour, I could not find any other discrepancies between what I

9   had been provided and what I produced in Rule 26 and what

10  Mr. Katz gave back to me with a Rule 26.

11          THE COURT:  Other than those two pages.

12          MR. TYLER:  Those two pages.

13          THE COURT:  Okay.  And then using the Bates stamp from

14  the original file, have you figured out what wasn't produced

15  to Mr. Katz --

16          MR. TYLER:  Yes.

17          THE COURT:  -- in response to the subpoena?

18          MR. TYLER:  Yes.  Twelve pages of the discrepancy in

19  numbers are simply not records; tabs, dividers, and the

20  covers.

21          THE COURT:  Okay.  Hang on.

22          MR. TYLER:  There is a what I call --

23          THE COURT:  Hang on.

24          MR. TYLER:  Yes.

25          THE COURT:  Okay.  So that's 12 pages; tabs, dividers,

1    and covers.

2            MR. TYLER:  Right.

3            THE COURT:  Okay.

4            MR. TYLER:  There is a one page, what I call a face

5    sheet, which is 30002.  This is the inpatient -- it's the

6    admission/discharge log sheet.

7            THE COURT:  Got it.

8            MR. TYLER:  Which just says he was here and seen in

9    outpatient between X and Y.

10           THE COURT:  Okay.

11           MR. TYLER:  There are five pages of Mr. Katz's

12   subpoena that I didn't get.

13           THE COURT:  What are those?

14           MR. TYLER:  Those are 30005 through 30009.

15           THE COURT:  A certificate of death was part of the

16   subpoena?

17           MR. TYLER:  Yes.  They had to produce that to show

18   their right to receive documents pertaining to someone other

19   than the signator.

20           THE COURT:  Okay.

21           MR. TYLER:  Then there are eight what I call requests

22   for information, which are essentially HIPAA releases that

23   were authored by the decedent during services provided to him

24   in --

25           THE COURT:  What are the Bates stamp numbers?

1          MR. TYLER:  14 through 16.

2          THE COURT:  30014?

3          MR. TYLER:  Yes.  Sorry.  Through 30016.

4          THE COURT:  Okay.

5          MR. TYLER:  30028 through 30030, 30035, and another

6    one at 30046.

7          THE COURT:  Okay.

8          MR. TYLER:  And there's eight pages altogether.  And

9    those pertain to three separate periods of service in 2008,

10   including -- that would be by Ms. Severance during the course

11   of her workup on Mr. Singh, and then there's another, and a

12   duplicate series of those, of that request, and then there's

13   another request for information that he made in 2006 and

14   another one in 2004.

15         THE COURT:  Okay.

16         MR. TYLER:  Then we get to what I would call the

17   salient documents.  We have a Correctional Health --

18         THE COURT:  Hang on.  Hang on for a second.

19         MR. TYLER:  Yes.

20         THE COURT:  So 30028, for example, was not produced.

21         MR. TYLER:  That's correct.

22         THE COURT:  And that is --

23         MR. TYLER:  He is essentially authorizing here --

24         THE COURT:  The jail to contact his pharmacy.

25         MR. TYLER:  Right.

1          THE COURT:  To find out what his medication records

2     are.

3          MR. TYLER:  That's correct.

4          THE COURT:  Okay.

5          MR. TYLER:  And that's what all of these requests for

6     information are.  These are what you have to have to be able

7     to call someone and have them actually talk to you to provide

8     information that would otherwise be covered by HIPAA and/or

9     the California Medical Records Act.

10          THE COURT:  Are those duplicates, 30014 to 30016?

11          MR. TYLER:  Yeah.  There was another set that was --

12     and you'll see that the 28 is a yellow, and I think the

13     previous one, 14 through 16, are the same documents.  It

14     looks like it's one of these tear-away things, and so there's

15     two copies.  There's the first page and the second page.

16          THE COURT:  But they're dated March 12th.

17          MR. TYLER:  Yes, they are.

18          THE COURT:  Okay.  And they're signed by

19     Ms. Severance.

20          MR. TYLER:  Yes, they are.

21          THE COURT:  Okay.  And so Ms. Severance obviously knew

22     on March 12th that at least he had prescriptions.

23          MR. TYLER:  Well, yes, that he was claiming

24     prescriptions.  And then she asked him, as will be detailed.

25     Actually, I think these are misdated, but that's a whole

1    other can of worms, because I mean she saw him on the 13th.

2    I haven't talked to her about that, whatever.  I mean her

3    only notes are from the 13th.  Her only log-in is on the

4    13th.  But yes, she talks to him, and he says I have these

5    medications.  I'm getting them from here.  She fills this out

6    and says Rite Aid on Gerber Road and such, and then he signs

7    it, and then she can go and track down to verify.

8              THE COURT:  I was just looking at the chronology.  He

9    was seen by Ms. Severance at 7:30 in the morning on

10   March 13th.

11             MR. TYLER:  Yes.

12             THE COURT:  Okay.

13             MR. TYLER:  Maybe she still thought it was the 12th.

14   I don't know.  But I'm sure we'll find out.

15             THE COURT:  Okay.  And then the other documents.

16             MR. TYLER:  The other documents.  This is what really

17   precipitated my angst on Thursday.

18             THE COURT:  Right.

19             MR. TYLER:  And this is what's called a "Request for

20   Provider Services" from the Correctional Health Services

21   Division Case Management Program.

22             THE COURT:  Give me the Bates numbers first.

23             MR. TYLER:  And the Bates numbers are 30017 and a

24   like, while another copy of that same document, at 30027.

25   These are the same --

1             THE COURT:  Dated March 10th.

2             MR. TYLER:  Correct.

3             THE COURT:  There's handwriting on it.

4             MR. TYLER:  Well, there's handwriting on one, and the

5     other is, it's another one of these, there's a yellow one

6     with a white one.  The white one has handwriting all over it.

7     The yellow one looks like the top copy on one of these

8     pull-apart forms without handwriting on it.  But other than

9     that, I mean I've looked at them, it's the same.

10            THE COURT:  Does 30017, it's not identical to --

11            MR. TYLER:  No, it's got handwriting on it.  But the

12    underlying document is -- it looks like somebody tore apart

13    the document and then wrote all over it.

14            THE COURT:  And this is a form used by the jail staff

15    sent to JPS; right?

16            MR. TYLER:  Yes.

17            THE COURT:  And so it's dated March 10th.  And it

18    mentions at least two prescriptions that would normally be

19    associated with a mental health issue.

20            MR. TYLER:  That is correct.

21            THE COURT:  And who does this go to, someone at JPS?

22            MR. TYLER:  Yes.  Because that's who, if you look in

23    the middle of that, it says "Specialty Clinic Requested," and

24    it says "JPS."

25            THE COURT:  And this is right when he comes back from

1    Davis.

2              MR. TYLER:  Yes.

3              THE COURT:  Okay.

4              MR. TYLER:  Do you want to know how that occurs?

5              THE COURT:  I'm going to let Mr. Katz ask questions.

6              MR. TYLER:  Okay.

7              THE COURT:  That's why the witnesses are here.

8              MR. TYLER:  Okay.

9              THE COURT:  We'll see if we can determine whose

10   handwriting it is as well.

11             MR. TYLER:  Then I found a -- what appears at the next

12   page is 30018.

13             THE COURT:  Okay.

14             MR. TYLER:  And this is a custody request dated on the

15   11th.  And I don't know what the crossed-out stuff is.  It

16   says something, "Takes meds.  Gets crazy without them."

17             THE COURT:  Do you know whose handwriting that is?

18             MR. TYLER:  Probably -- it says "Staff Receiving

19   Referral."  It's a telephone call, I think.  And that would

20   be somebody that I only know as Sami.

21             THE COURT:  Staff receiving referral.  Okay.

22             MR. TYLER:  And it looks like she gets a phone call --

23             THE COURT:  At 1:00 in the morning.

24             MR. TYLER:  And writes all this down.

25             THE COURT:  Is that 1:00 in the morning or 1:00 in the

1    afternoon?  Do they use military time?

2              MR. TYLER:  They should.

3              THE COURT:  Okay.

4              MR. TYLER:  Well, no, I don't know.

5              THE COURT:  They should, but you don't know for sure.

6              MR. TYLER:  Right.

7              THE COURT:  And you don't know who Sam or Sami is.

8              MR. TYLER:  I know that she is or was a JPS employee.

9    I've not spoken to her.

10             THE COURT:  Like a clerk-type employee?

11             MR. TYLER:  Yes.

12             THE COURT:  Okay.  Still working there?

13             MR. TYLER:  No.  I turned and see nods in the gallery

14   in back of me.

15             THE COURT:  I see some people shaking their heads no.

16             MR. TYLER:  That's correct.

17             THE COURT:  Okay.  What happens -- well, it goes in

18   this JPS file.  I know what happens.

19             MR. TYLER:  Well, it goes in and somebody --

20             THE COURT:  Somebody is supposed to look at it.

21             MR. TYLER:  Correct.

22             THE COURT:  Okay.  All right.

23             MR. TYLER:  The next is four pages of CATS printouts.

24             THE COURT:  Bates stamp?

25             MR. TYLER:  Bates stamp 30020 through 21 and 30025

```
 1    through 26.

 2              THE COURT:  Okay.

 3              MR. TYLER:  And these all --

 4              MR. KATZ:  30019 is part of the CATS as well, your

 5    Honor.

 6              MR. TYLER:  I'm sorry.  Is that correct?

 7              THE COURT:  By the way, CATS stands for Client

 8    Activity Tracking System, but we'll refer to it as CATS.

 9              MR. TYLER:  He's absolutely correct.  So there's five

10    pages.

11              THE COURT:  It starts at 19.

12              MR. TYLER:  It starts at 19.  That would appear to

13    probably have been done in 2006 because the last entry is

14    from 2005.

15              THE COURT:  Okay.

16              MR. TYLER:  And the other four that I have are done by

17    somebody --

18              THE COURT:  There's handwriting on 21.

19              MR. TYLER:  That's correct.  And yes.  And this is

20    certainly done in 2008, because the last entry, if you look

21    at page 30021, it's 1/28/08, which is actually an entry from

22    SMHTC, from Sacramento County Mental Health Treatment Center.

23              THE COURT:  Do you know what MDD stands for?

24              MR. TYLER:  Major mood disorder.

25              THE COURT:  And then ETON Dep?
```

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1          MR. TYLER:  Alcohol dependence.  That's what this

2     provides.

3          THE COURT:  Is that an N or an H?

4          MR. TYLER:  It's an H.

5          THE COURT:  ETOH?

6          MR. TYLER:  ETOH.  That is medical-ease for alcohol.

7     It's ethanal, actually.

8          THE COURT:  Okay.  Dependent.

9          MR. TYLER:  Yes.

10         THE COURT:  And then on 25, it says ETOH, and then it

11    looks like J something, or maybe not.

12         MR. TYLER:  Yeah.  It's another -- yeah.  ETOH

13    dependence, if one will, mood disorder, alcohol intoxication.

14         THE COURT:  So the 303 series is alcohol dependence.

15         MR. TYLER:  Right.  And then 26 --

16         THE COURT:  I know my DSMs.

17         MR. TYLER:  If one had an Excel spreadsheet, it's the

18    way it would come out if it went across the page too far, and

19    it looks like just a continuation of the same information.

20         THE COURT:  Got it.

21         MR. TYLER:  I don't know.  There's one other document

22    in here.  If you look at 30024, and I don't know whether this

23    is part of the same document as 25, because it says "pause."

24         THE COURT:  Well, did Mr. Katz get 24?

25         MR. KATZ:  No.

1              MR. TYLER:  No.  I didn't either.

2              THE COURT:  Well, wait.  You said 30019 through 30021,

3       then you said 30025 through 3026, 30026.  Sorry.

4              MR. TYLER:  That's right.  Actually, I'm looking at

5       24, and it's in there as well.

6              THE COURT:  So it should be 30024 through 30026.

7              MR. TYLER:  Those three pages are probably all a

8       single printout.

9              THE COURT:  Do we know whose handwriting that is?

10             MR. TYLER:  I do now.

11             THE COURT:  Whose is it?

12             MR. TYLER:  Tompkins'.

13             THE COURT:  Okay.  All of this is Mr. Tompkins'

14      handwriting?

15             MR. TYLER:  That's what he tells me.

16             THE COURT:  Okay.

17             MR. TYLER:  Actually, this is the document that

18      precipitated my inquiry initially.  And this is what they

19      call a flimsy.

20             THE COURT:  Bates number.

21             MR. TYLER:  30022, 30023.  Because that is the inquiry

22      that I was making last Thursday.  Where is it?  I should have

23      it.

24             THE COURT:  That's the Sacramento Sheriff's Department

25      Receiving Screening.

```
 1              MR. TYLER:  That is correct.

 2              THE COURT:  Okay.  It looks like Mr. Tompkins'

 3      handwriting again.

 4              MR. TYLER:  Some, but not all.

 5              THE COURT:  Who else's handwriting is on there?

 6              MR. TYLER:  I don't know at this point.

 7              THE COURT:  None of the doctors say it's theirs?

 8              MR. TYLER:  Well, actually, I don't know.  This might

 9      all be his handwriting.  I'm sorry.

10              THE COURT:  It's signed down below.

11              MR. TYLER:  Well, that's by --

12              THE COURT:  By Mr. Singh and then there's a nurse's

13      signature.

14              MR. TYLER:  The nurse is the intake nurse at the

15      jail's booking area.

16              THE COURT:  Okay.

17              MR. TYLER:  And what they do is they come through, as

18      the person is booked, they do an assessment of them, a

19      receiving screening, and decide whether they're fit for

20      incarceration, if one will, or whether they need to go to 2P

21      or 2M or whatever.

22              THE COURT:  "Are you currently taking any psychiatric

23      meds?"  Answer:  "Yes.  See back."

24              MR. TYLER:  Yes.

25              THE COURT:  What's it say on the back?
```

1          MR. TYLER:  This one says nothing.

2          THE COURT:  Right.

3          MR. TYLER:  This is another triplicate form.  You can

4    tell from the -- this is a yellow, and it comes in -- that's

5    why it's called a flimsy.  People start taking these

6    carbonless forms apart.  Yes, this is blank on the back.

7          THE COURT:  "Psychiatric referral" is checked.

8          MR. TYLER:  Yes.  That's why we got it.

9          THE COURT:  And this is March 5th.

10         MR. TYLER:  That's correct.

11         THE COURT:  Where is this form?  This form was also

12   sent over to JPS then.

13         MR. TYLER:  That's correct.

14         THE COURT:  Someone is supposed to look at it; right?

15         MR. TYLER:  Well, someone did.

16         THE COURT:  We just don't know when.

17         MR. TYLER:  Well, it's pretty clear that it was early

18   on.  I mean if you look, it says "arrested."

19         THE COURT:  Early on meaning what?  He wasn't there

20   from March 5th to March 10th.

21         MR. TYLER:  Well, except that if you look and it says

22   arrested March 4th, under the influence, and then down below

23   it says court date 3/6, that was his original court date

24   which got scrubbed because he went off to UC Davis Medical

25   Center.  So one can infer that it was fairly early on because

1    that court date changed.

2              THE COURT:  Yeah, but here's the problem.  He comes

3    back on March 10th; right?

4              MR. TYLER:  That's correct.

5              THE COURT:  And he's not put into or seen until

6    March 13th by Ms. Severance; right?

7              MR. TYLER:  That's correct.

8              THE COURT:  What happens during those three days?

9              Nothing.

10             MR. TYLER:  Yeah.

11             THE COURT:  Okay.

12             MR. TYLER:  Well, I mean --

13             THE COURT:  Is someone going to be able to explain

14   that?

15             MR. TYLER:  I'm sure that Mr. Katz will inquire of

16   them.

17             THE COURT:  Are you going to be able to defend against

18   that?

19             MR. TYLER:  Why not?

20             THE COURT:  Someone who is supposed to be seen by JPS

21   sits in a cell, and he wasn't in the psychiatric unit, he was

22   in general population, wasn't he?

23             MR. TYLER:  Yes, he was.

24             THE COURT:  And then he makes a suicide attempt?

25             MR. TYLER:  After he's seen.

1          THE COURT:  He makes a suicide attempt that then sends

2     him sent back to UC Davis, and then he's seen.  You don't

3     call that a suicide attempt, but --

4          MR. TYLER:  He's seen before this ace bandage incident

5     by Lori Severance.  That's what she's doing, is responding to

6     the --

7          THE COURT:  Not until March 13th though.

8          MR. TYLER:  Okay.

9          THE COURT:  Right?

10         MR. TYLER:  Yes.

11         THE COURT:  Well, what happens when he comes back on

12    the 10th?

13         MR. TYLER:  I'm assuming that these forms get filled

14    out.  And I'm not exactly --

15         THE COURT:  These forms are already in his file.  Why

16    isn't somebody looking at them?

17         MR. TYLER:  The flimsy is in his file.  This 30022 or

18    30023 is probably in his file, is what it looks like to me.

19    It's unclear as to when the CHS request for services which

20    is, in turn, derived from the discharge instructions from

21    UC Davis, arrives.  It might have arrived on the 11th.

22         THE COURT:  The request for services is made on

23    March 5th, according to this document, 30022.

24         MR. TYLER:  No.  That's a -- that's correct.

25         THE COURT:  Psychiatric referral is checked; right?

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1              MR. TYLER:  That's correct.

2              THE COURT:  Which means it's supposed to place him on

3      a list that gets him a psychiatric referral to JPS.

4              MR. TYLER:  Well, he's then seen in what's called an

5      intake triage such as what Ms. Severance performed.

6              THE COURT:  Not until the -- well, we're going in

7      circles.

8              MR. TYLER:  Well, yes.

9              THE COURT:  Not until the 13th.

10             MR. TYLER:  Yeah, but he's gone.

11             THE COURT:  He's not gone.  He's in the jail on the

12     11th and the 12th.

13             MR. TYLER:  That's correct.

14             THE COURT:  Nobody sees him.

15             MR. TYLER:  That's probably correct.

16             THE COURT:  Okay.  It might have been helpful to know

17     that during the summary judgment motion, wouldn't it?

18             MR. TYLER:  Okay.

19             THE COURT:  I'm not picking on you.  You're the

20     lawyer, and I understand.  But one of my concerns I now have

21     is I granted summary judgment on deliberate indifference as

22     to Dr. Sokolov.  And the question is do these documents make

23     a difference?  That's one of the things we're going to have

24     to argue this morning, as to whether that claim is now back

25     alive because of documents like this.  I don't know.  We're

1    going to have to take testimony.  But that's one of my

2    questions.  I granted summary judgment in your favor for

3    Dr. Sokolov.

4          Okay.  What else?  Anything else that wasn't produced?

5          MR. TYLER:  Yes.  We have what I call -- I think

6    it's -- I can't even read my own handwriting.  This was done

7    last evening, shall we say.

8          What I have is 12 pages of what I call demographics

9    and PF documents.  The demographics are --

10         THE COURT:  Bates stamp numbers.

11         MR. TYLER:  Yes.  30036 through 38, 42 through 43, 49

12   through 53, 55 through 56.

13         THE COURT:  Okay.

14         MR. TYLER:  These are printouts that somebody made at

15   or about the time that they were working up the file, or

16   whatever it is, that are derived from these PF documents.

17   And I think the demographics, although I'm not sure, are

18   printouts of screens that come up on the county computer, the

19   county custody computer called JIMS.  And then they refer to

20   these, there's I think ten screens, and you have PF1, PF2, PF

21   whatever.  These appear to be something that somebody pressed

22   the print button on at the time they were seeing Mr. Singh.

23         THE COURT:  You didn't mention 39.

24         MR. TYLER:  I'm sorry?

25         THE COURT:  Should that have been included?

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

```
 1                MR. TYLER:  Let me look at 39.

 2                THE COURT:  That's a PF8 also.

 3                MR. TYLER:  It should have been if that's what it is.

 4     Yes.

 5                THE COURT:  Okay.  So 36 through 39.  42.  43 is

 6     something different.  That's a receiving screening document

 7     from May 6, 2004.  You're not including that; right?  Was

 8     that previously produced?

 9                MR. TYLER:  No.

10                THE COURT:  43?

11                MR. TYLER:  43 was not previously produced either.

12                THE COURT:  Okay.  But that's from 2004; right?

13                MR. TYLER:  Yes.

14                THE COURT:  Okay.

15                MR. TYLER:  I didn't get that either.

16                THE COURT:  And then 44 was previously produced.

17     That's a request for psychiatric services that was from May

18     of 2004.

19                MR. TYLER:  Yeah, that was produced.  And that was in

20     my file.  That was produced to him and produced to me

21     initially.

22                THE COURT:  Okay.  And then 49 and 50, 51, 52, 53, 55

23     and 56.  Okay.  All right.  What else?

24                MR. TYLER:  We talked about the CATS from '05,

25     demographics.  Oh, there's a page 34, 30034.  This is a
```

 1    request for psychiatric services it looks like from Mr. Singh

 2    himself from 2006.

 3             THE COURT:  Okay.

 4             MR. TYLER:  I never saw that before.  Mr. Katz never

 5    saw it before.

 6             THE COURT:  Okay.

 7             MR. TYLER:  Then we have three pages, 60, 66, and 67.

 8             THE COURT:  60, 66, and 67.

 9             MR. TYLER:  These are another form of what I call a

10    face sheet.  These are capsulizations of information that are

11    kept on the front portions of the file.  These are called

12    medication profiles and logs.  But it's a face sheet that's

13    put on the top of a document so that if a person picks it up,

14    they can see --

15             THE COURT:  On 60, what does that say?

16             MR. TYLER:  "Received 11/27/06."

17             THE COURT:  No.  "Known contradictions, allergies,

18    precautions."  Do you see that line?

19             MR. TYLER:  Oh, yes, yes, yes, yes.

20             THE COURT:  Is that NKDA?

21             MR. TYLER:  Drug allergies.  NKDA means no known drug

22    allergies.

23             THE COURT:  And then --

24             MR. TYLER:  "History of pancreatitis and diabetes."

25             THE COURT:  Okay.

1          MR. TYLER:  That's what's underneath all of that.

2          THE COURT:  And then on 66.

3          MR. TYLER:  66 is --

4          THE COURT:  From 2004.

5          MR. TYLER:  Yes.  Again, NKDA.

6          THE COURT:  It also mentions Wellbutrin and Seroquel.

7          MR. TYLER:  Yes.

8          THE COURT:  And then the same thing on 67.  That's

9    from 2004.

10         MR. TYLER:  Correct.

11         THE COURT:  Okay.  All right.  Anything else?

12         MR. TYLER:  57.  Yes.  Three pages of a CDC fax

13   appearing at pages 30057 through 30059.  And this is, if you

14   look at it, down on the bottom, you'd have to flip it over,

15   but it just says that it was faxed to the jail on

16   September 15th, 2003.  And these are documents that

17   apparently were requested and then sent over to the jail from

18   the California Department of Corrections.

19         THE COURT:  Okay.

20         MR. TYLER:  And I'm a little unclear.  It looks as

21   though he was coming back to the jail from CDC so they sent

22   this over for continuity of care.  Those pages weren't

23   produced to either of us initially.

24         And that's what I found.

25         THE COURT:  And again, as we talked about on Friday,

 1   when the subpoena was received, do we know who the person was

 2   that was assigned to respond to the subpoena?

 3            MR. TYLER:  Yes.

 4            THE COURT:  What was her name?

 5            MR. TYLER:  I've got it here.  It actually appears on

 6   page 30005.  No.  Sorry.  30006.  Vernessa Lauria,

 7   L-A-U-R-I-A.  You can see the fax from Mr. Katz' office over

 8   to her saying here's the release.

 9            THE COURT:  Do we know whether she talked to anyone

10   once she received the subpoena?

11            MR. TYLER:  Well, she certainly talked to Dr. Sokolov.

12   Because if you look on page 30007, there's the authorization

13   itself, at least the front page of it.  It's a multipage

14   form.  And he says "approved."

15            THE COURT:  Do we know what -- well, he's here.  I

16   guess Mr. Katz can ask him what his conversation was with

17   Ms. Lauria.

18            MR. TYLER:  I'm sure that that will be asked of him.

19            THE COURT:  Do we know why she only copied what she

20   copied?

21            MR. TYLER:  I have my suppositions.

22            THE COURT:  Okay.  Other than suppositions?

23            MR. TYLER:  Past experience.

24            THE COURT:  Do we know where she is?

25            MR. TYLER:  Not exactly.

1          THE COURT:  Let's not beat around the bush.  The

2     obvious question is:  Did Dr. Sokolov tell her only copy

3     certain things?  Don't copy --

4          MR. TYLER:  No.

5          THE COURT:  Okay.  We'll get that testimony under

6     oath.  But that's the elephant in the room, folks.

7          MR. TYLER:  That's right.

8          THE COURT:  Okay.  Do you know why you didn't receive

9     the entire file when you asked for it as part of your

10    Rule 26?

11         MR. TYLER:  Well, I had previously been provided what

12    I thought was the entire file.  I mean that's what happens.

13         THE COURT:  Well, the question is did they give you

14    the green folder that I'm holding in my hand, Court

15    Exhibit 1?

16         MR. TYLER:  Absolutely not.

17         THE COURT:  Okay.  So you just basically said --

18         MR. TYLER:  I've done UC Regents work for 24 years.  I

19    never see the original file.  I am provided a copy of the

20    original file from Risk Management, and that's exactly what

21    occurred here.  And I had no reason to suspect that I

22    received anything other than the original file.

23         The only times I've ever gone to look at the original

24    file was, I can recall one case in 1997, when I wanted to see

25    if there was other markings on the file that didn't appear in

1    the Xerox copying.

2             THE COURT:  In light of what occurred in this case,

3    might you change your practice?

4             MR. TYLER:  I might.

5             THE COURT:  Okay.  All right.  Mr. Katz, how do you

6    wish to proceed?

7             MR. KATZ:  If the Court would indulge, I would prefer

8    to do the questioning first and then do my argument after it,

9    because I believe certain facts will be adduced that will not

10   be adduced if I make that argument in advance.

11            THE COURT:  It's pretty hard to make arguments without

12   facts, so that would probably make sense.

13            MR. KATZ:  Thank you.

14            THE COURT:  All right.

15            MR. KATZ:  We would ask, first of all, that

16   Mr. Tompkins be called.

17            THE COURT:  All right.  Mr. Tompkins, step forward.

18            Mr. Katz, if I think you're going outside the scope of

19   the purpose of this hearing, which is to allow you to ask

20   questions about the original documents, I'll let you know.

21            MR. KATZ:  Absolutely.  I intend to try to be focused.

22            THE COURT:  Okay.

23            MR. KATZ:  Your Honor, with the Court's permission, I

24   want to make sure the witness has a copy of his deposition

25   and the exhibits just so we don't beat around the bush.

 1              THE COURT:  Okay.

 2                    LYNN MICHAEL TOMPKINS,

 3      a witness called by the Plaintiff, having been first duly

 4      sworn by the Clerk to tell the truth, the whole truth, and

 5      nothing but the truth, testified as follows:

 6              THE WITNESS:  I do.

 7              THE CLERK:  State your full name and spell your last

 8      name, please.

 9              THE WITNESS:  Lynn Michael Tompkins, T-O-M-P-K-I-N-S.

10                    DIRECT EXAMINATION

11      BY MR. KATZ:

12      Q.      Mr. Tompkins, do you recall being deposed in this

13      action on January 23rd of 2012?

14      A.      I do.

15      Q.      And that deposition was videotaped and actually took

16      place in your attorney's office; correct?

17      A.      Correct.

18      Q.      Do you recall if you brought with you a number of

19      documents that you reviewed in anticipation of your

20      deposition?

21      A.      Correct.

22      Q.      And do you recall that those 19 pages were marked and

23      attached to your deposition as a separate exhibit?

24      A.      I think so.

25      Q.      And if you need to refresh your recollection on that,

1    Exhibit 44 is on the certified copy of the deposition before

2    you.

3    A.      Okay.

4    Q.      Now, in particular, those 19 pages included a CATS

5    printout; correct?

6    A.      Correct.

7    Q.      And you left JPS in May of 2011?

8    A.      Correct.

9    Q.      And just so we're clear, sir, if you would look at

10   those pages, am I correct the CATS printout consists of the

11   last eight pages of Exhibit 44?

12   A.      Correct.

13   Q.      That's the complete CATS printout; correct?

14   A.      I don't know if it's complete or not, but it looks

15   like what I brought to the deposition.

16   Q.      Where did you get that from?

17   A.      From the computer database at the jail.

18   Q.      When?

19   A.      I don't remember.

20           THE COURT:  You don't remember when you printed it

21   out?

22           THE WITNESS:  No.

23           THE COURT:  Was it right before your deposition?

24           THE WITNESS:  No.  It had to be after Mr. Singh's

25   demise.

1          THE COURT:  So sometime between March of 2008 and

2     January of 2012.  That's the best estimate you can give us?

3          THE WITNESS:  Well, it would have to be in that time

4     frame, your Honor, but I'm not sure when.

5          THE COURT:  Is this exhibit, these eight pages from

6     Exhibit 44 to his deposition, in the JPS file?

7          MR. TYLER:  No.

8          MR. KATZ:  No.  Well, that's actually -- your Honor, I

9     was going to get to that later, but this will show that the

10    file is cooked, your Honor.

11         THE COURT:  Well, don't argue yet.

12         MR. KATZ:  Okay.

13    Q.    BY MR. KATZ:  So, first of all, on the JPS CATS file,

14    pages -- if I could give the Court and Mr. Tyler the exhibit

15    I prepared.

16         THE COURT:  Okay.

17    Q.    BY MR. KATZ:  Now, directing your attention to the

18    first page of -- if we could call this Exhibit 2 for this

19    hearing, your Honor.

20         THE COURT:  Court Exhibit 2.

21         MR. KATZ:  Thank you.

22         THE COURT:  Mr. Vine.

23                    (COURT EXHIBIT 2, Demographic

24                    Information, MARKED FOR

25                    IDENTIFICATION.)

 1    Q.     BY MR. KATZ:  And, Mr. Tompkins, is it correct that

 2    Court Exhibit 2, the first page matches your first -- this is

 3    a copy of, if you look through the JIMS printout -- I'm

 4    sorry, the CATS printout is the same as your eight-page

 5    printout; correct?

 6    A.     It looks like it, yeah.

 7    Q.     Okay.  Now, directing -- to answer the Court's

 8    question -- and actually I don't know if you have a copy.  If

 9    I could give this to the witness so he can follow along.

10         THE COURT:  What you have, Mr. Tompkins, which is

11    marked 30000 to 30105, is a copy of the original JPS file

12    that was produced this morning.

13         THE WITNESS:  Okay.

14         MR. KATZ:  And that's a copy of Court Exhibit Number

15    1.

16         THE COURT:  Right.

17    Q.     BY MR. KATZ:  So is it correct that your first page of

18    the CATS matches page 30019?

19         MR. TYLER:  It's vague and ambiguous.  I mean these

20    documents -- I mean you can compare them.

21         THE COURT:  Overruled.  The Court will take note that

22    the printed portion is identical to 30019.  There is no

23    handwriting on 30019.

24         MR. KATZ:  The printed portion.

25         THE COURT:  Right.

```
1              MR. TYLER:  Correct.

2    Q.     BY MR. KATZ:  And the second page of the CATS --

3              THE COURT:  Hang on a second.  Is that your

4    handwriting, Mr. Tompkins?

5              THE WITNESS:  On this document?

6              THE COURT:  On Court Exhibit 2, the blue document.

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  All right.  Go ahead, Mr. Katz.

9    Q.     BY MR. KATZ:  And by the way, before we get to that

10   page, you've printed out lots of CATSs in your history;

11   right?

12   A.     Correct.

13   Q.     And then when there are additional pages, it prints

14   "pause," right, at the bottom of the page?  That's the page

15   break?

16   A.     I can't remember.

17   Q.     You can't remember.  Okay.  So the second page of the

18   text -- in other words, the printed portion of the CATS

19   record matches pages 30020 and 30021; correct?

20   A.     Looks like it, yes.

21   Q.     And there's some handwritten notations on 30021, and

22   that's your handwriting; correct?

23   A.     Correct.

24   Q.     When did you make those handwritten entries?

25   A.     Which ones?
```

1    Q.      Thank you.  The ones on 30021.

2    A.      It must have been when I saw Mr. Singh.

3    Q.      Well, when you saw Mr. Singh, though, you didn't have

4    the file with you; correct?

5    A.      I didn't physically have it with me when I saw him,

6    but I looked at it before I saw him.

7    Q.      So it's your testimony then that these notes were made

8    prior to your seeing Mr. Singh?

9    A.      Correct.

10   Q.      Are you sure about that, sir?

11   A.      Reasonably.

12   Q.      Okay.  And you're able to do that because there was a

13   CATS file in the folder?

14   A.      Right.  And I would have been the one that made these

15   notations.

16   Q.      Okay.

17           THE COURT:  Well, let's make sure the record's clear.

18   You're talking now about the notations on 30021, correct, or

19   are you talking about the notations on Court Exhibit 2?

20           THE WITNESS:  Well, they're both my handwriting.

21   Q.      BY MR. KATZ:  Right.  But I request -- and I apologize

22   for not being clear.  The handwritten notations on page JP

23   30021 were made by you prior to your seeing Baljit Singh on

24   March the 14th, 2008; correct?

25   A.      I believe that is true.

1   Q.     Okay.  And after that page, that also had a pause;

2   correct?

3   A.     I don't know what that means.

4   Q.     Okay.  Well, you're familiar with the CATS form

5   generally, aren't you?

6   A.     Yes.

7   Q.     And it has three categories of information in there;

8   correct?

9   A.     (No response.)

10   Q.     Diagnosis?

11   A.     Right.

12   Q.     Treatment.  Correct?

13   A.     (No response.)

14   Q.     Movement, history, and treatment; right?  Those are

15   the three categories?

16   A.     How do you mean treatment?

17   Q.     Well, a CATS lists treatment, doesn't it?

18   A.     It's been a long time since I've looked at these.

19   Q.     Why don't you look at your exhibit.  Maybe I'm jumping

20   ahead.  Page -- let's just move ahead one at a time.

21          So you made a handwritten notation on page 30021, and

22   this was the second page of the CATS that you produced.  Let

23   me now turn to the third page.

24          MR. TYLER:  No.  I'm sorry.  30021 is what's recently

25   produced.

1          THE COURT:  Right.

2          MR. KATZ:  Right.

3          THE COURT:  There's a difference between 30021, which

4    is Court Exhibit 1, and then Court Exhibit 2, the second

5    page, there's a lot more notations.

6          MR. KATZ:  Correct.

7          THE COURT:  We haven't established when he made those

8    notations.  And as I understand it, Mr. Tompkins, again

9    looking at the blue sheets, the second page, you can't recall

10   at this time when you made those?

11         THE WITNESS:  No, but it was after Mr. Singh's demise.

12         THE COURT:  Right.  And sometime before your

13   deposition?

14         THE WITNESS:  Right.

15         THE COURT:  Okay.  And you printed these off of the

16   computer; right?

17         THE WITNESS:  Correct.

18         THE COURT:  You just can't remember when you did that?

19         THE WITNESS:  No.  But it was probably shortly after

20   his demise.

21         THE COURT:  Well, if you had done that, why wouldn't

22   these have gone into the JPS file?

23         THE WITNESS:  Because I believe the file was already

24   sealed.

25         THE COURT:  So let's assume you printed these out

1    sometime in April of 2008.

2          THE WITNESS:  Okay.

3          THE COURT:  Where have they been?

4          THE WITNESS:  In my own little file.

5          THE COURT:  Oh, you have your own little file?

6          THE WITNESS:  And I brought it to the deposition.

7          THE COURT:  Okay.  Got it.

8          THE WITNESS:  And, your Honor, the reason I brought

9    the --

10         THE COURT:  Let me ask this.  You had already left

11   JPS.  You left in May of 2011; right?

12         THE WITNESS:  Correct.

13         THE COURT:  So you kept your own file after you left?

14         THE WITNESS:  Just the materials that Mr. Tyler sent

15   me plus the CATS printout.

16         THE COURT:  Why would you keep the CATS printout?

17         THE WITNESS:  Because in case there was a lawsuit, I

18   wanted to be able to recap what had happened and what I'd

19   done and be familiar with the case.

20         THE COURT:  Did you have authorization to keep client

21   records?  I mean you didn't work there anymore.

22         THE WITNESS:  Probably not.

23         THE COURT:  Okay.  Go ahead.

24   Q.    BY MR. KATZ:  Now, the third page of your CATS, that

25   matches the recently produced page 30026; correct?

1    A.        It looks like it, yes.

2    Q.        And can you tell us what this portion -- now, that's

3    the second page regarding what's called Client Movement

4    History; correct?

5    A.        Correct.

6    Q.        And what is Client Movement History for the purposes

7    of this CATS?

8    A.        It means which facility were they treated in, the

9    jail, Sacramento County Mental Health Treatment Center,

10   Turning Point, so forth.   County-affiliated providers.

11   Q.        And you were particularly interested in the most

12   recent data; correct?

13             THE COURT:  Before we get there, what does DIS stand

14   for?

15             THE WITNESS:  Discharge.

16             THE COURT:  ADM?

17             THE WITNESS:  Admit.

18             THE COURT:  So this is just a history of discharge and

19   admit.  Is there significance in the numbers, 84131508?

20             THE WITNESS:  Where are you seeing that one?

21             THE COURT:  I'm looking at 30026 or --

22             THE WITNESS:  I don't remember what that is.  I think

23   the last two digits tell us which facility it was.

24             THE COURT:  Okay.  This is just when he was discharged

25   and when he was admitted.

```
 1              THE WITNESS:  Correct.

 2              THE COURT:  Got it.  Okay.

 3   Q.      BY MR. KATZ:  Let me direct your attention to your

 4   page 4.  Do you see that, sir?

 5   A.      On which page are we?

 6   Q.      Well, it's blue page 4 or, which coincides with -- the

 7   computer printout part coincides with the fourth page of your

 8   CATS which would be Exhibit 44 that you produced, that you

 9   made a copy of.

10   A.      Is that the one that starts with a date 9/15?

11   Q.      No, sir.  It starts with, the top of the page, sir, it

12   starts with an entry of January 28, 2008.

13              THE COURT:  This is Court Exhibit 2.  It's the blue

14   pages.

15              THE WITNESS:  Okay.  I see it.

16              THE COURT:  Down below, just so you know, there's

17   little numbers.  We're now on page 4 of Court Exhibit 2.

18              THE WITNESS:  I'm with you.

19              THE COURT:  All right.  Go ahead, Mr. Katz.  And your

20   question was what?

21   Q.      BY MR. KATZ:  Yes.  And you printed that out in your

22   full CATS printout; correct?  That's your page 4.

23   A.      Okay.

24   Q.      And that page doesn't appear anywhere in the JPS file

25   despite the fact that -- does it?
```

 1            MR. TYLER:  Well, he's not reviewed the original JPS

 2    file.  Calls for speculation.

 3            THE COURT:  There's no foundation on that.

 4    Q.      BY MR. KATZ:  All right.  And that's the start of

 5    what's called a treatment history reported on CATS; correct?

 6    A.      I believe so.

 7            THE COURT:  Mr. Katz, you're saying page 4 from

 8    Exhibit 44 you have not been able to find in the original JPS

 9    file?

10            MR. KATZ:  Correct.  But there's even more

11    significance, your Honor.

12            THE COURT:  I'm just trying to get the facts.

13    Q.      BY MR. KATZ:  And, in fact, once you put an entry in

14    the CATS, you can't pull it out again; correct?

15    A.      Well, I wasn't able to make any entries in the CATS.

16    Q.      That's right.  You were just able to access the

17    database and print it; correct?

18    A.      Correct.

19    Q.      And what page 4 shows is that your printout occurred

20    on March 16, 2008; correct?

21            THE COURT:  Because it says "treatment history"?

22            MR. KATZ:  Yes.

23            THE COURT:  Okay.  Does that refresh your recollection

24    as to when you might have printed this out?

25            THE WITNESS:  No.  How do you know that?

```
1            THE COURT:  See where it says "treatment history from

2    1/1/1980 to 3/16/2008"?

3            MR. TYLER:  It would call for speculation on his part.

4            THE COURT:  I'm just asking if it refreshes his memory

5    as to when he might have printed this out.

6            Do you see that?

7            THE WITNESS:  Yeah.  Then it must have been after 3 --

8    on or after 3/16.

9            THE COURT:  Well, right around that time or --

10           THE WITNESS:  I don't recall.

11   Q.      BY MR. KATZ:  You know you can't ask for treatment

12   history of a date that hasn't occurred yet; correct?

13   A.      True.

14   Q.      Correct?

15   A.      True.

16           THE COURT:  Okay.  So you understand the question;

17   right?  That means it's unlikely that you did this in 2009 or

18   2010 or 2011.

19           THE WITNESS:  No.  It was probably about that time.

20           THE COURT:  Okay.

21           THE WITNESS:  There's probably a way to figure out

22   exactly when I printed it out.  I just don't know how.

23           THE COURT:  Let me just clarify one other thing,

24   Mr. Katz.

25           Mr. Tompkins, you can only review and print out CATS
```

 1    information.  You can't input any information.

 2              THE WITNESS:  Correct.

 3              THE COURT:  Okay.  Who inputs this information, by the

 4    way?

 5              MR. KATZ:  The clerical folks at JPS.  There's someone

 6    who is designated to do the inputting.  There's someone that

 7    does the data input.  They don't use that database anymore,

 8    your Honor.  But that's how I knew there had to be a CATS,

 9    because one of the sheets was the sheet that gets entered

10    into CATS later.  So I knew that there had to be a CATS.

11              THE COURT:  Well, I know there's someone that enters

12    the actual data, but is there a doctor that says enter this

13    data?

14              MR. KATZ:  No.  They prepare a shorthand sheet that

15    gets entered into the CATS.

16              THE COURT:  Who does?  The doctors?

17              MR. KATZ:  No.  The CATS is entered into by -- it's

18    just a support person who does it.  30105 is the type of

19    sheet that leads to a CATS, is my understanding.

20              THE COURT:  Okay.

21              MR. TYLER:  Actually --

22    Q.    BY MR. KATZ:  Now --

23              THE COURT:  Go ahead.  Mr. Tyler, you were going to

24    say something.

25              MR. TYLER:  I was going to say something.

1          THE COURT:  Okay.

2          MR. TYLER:  The way that it happens is that

3   Lori Severance, for instance, when she sees Mr. Singh, fills

4   out a client data sheet which appears at JP 20054.  There's a

5   like document in the whole chart.  She fills out -- actually,

6   this one is different.  They fill out a form.  They say I saw

7   the person.  Here's the diagnosis.  Then a clerk enters that

8   into the system.

9          THE COURT:  So, for example, when Mr. Tompkins saw

10  Mr. Singh, Mr. Tompkins, you would have filled out a form,

11  and that should have been entered in the CATS system.

12         THE WITNESS:  I'm not sure what the nexus was.

13         THE COURT:  I wasn't asking what the nexus was.  I was

14  just asking about forms.  After you saw Mr. Singh, did you

15  fill out something so that visit could be recorded in the

16  CATS system?

17         THE WITNESS:  I put in a progress note.  But I think

18  Ms. Severance opening him for service is the one that would

19  have triggered the CATS entry.

20         THE COURT:  So you filled out a progress note.

21         THE WITNESS:  That's all I did was fill out a progress

22  note.

23         THE COURT:  Does that get into the CATS system too?

24         MR. KATZ:  No.

25         THE COURT:  Progress notes don't?

1          MR. KATZ:  No.

2          THE COURT:  Okay.  Go ahead.

3     Q.    BY MR. KATZ:  Directing your attention to the blue

4     page 4, the fourth page of your CATS, this shows that it was

5     opened by JPS, Ms. Severance, on March 13, 2008; correct?

6     A.    Yeah, it looks like it.

7     Q.    And the CATS printout that Ms. Severance would have

8     looked at would not have included that information; correct?

9     A.    Correct.

10          THE COURT:  Would not have included what information?

11          MR. KATZ:  That she had opened his file on March 13,

12    2008.

13    Q.    BY MR. KATZ:  Because what happens is she prints it

14    out before -- you print it out before you see the person;

15    correct?

16    A.    Correct.

17    Q.    And therefore your admission that you did at that time

18    would not be reflected on that CATS form.

19    A.    Correct.  It would be after the fact.

20    Q.    Yes.

21          THE COURT:  Got it.  Okay.

22    Q.    BY MR. KATZ:  Okay.  And, in fact, in your CATS, the

23    only indication as to the current way you can determine what

24    day the CATS is printed out is from this page 4; correct?

25          MR. TYLER:  Calls for speculation.

```
 1                THE COURT:  Sustained.
 2    Q.     BY MR. KATZ:  The last entries in time on the CATS
 3    that you printed out are on page 4; correct?
 4    A.     Correct.
 5                THE COURT:  Are you saying there's nothing past
 6    November 18, 2004?
 7                MR. KATZ:  On the other pages?
 8                THE COURT:  No, just on that page.
 9                MR. KATZ:  On that page, yes.  None of the other pages
10    show March 13, 2008.
11                THE COURT:  Right.
12                MR. KATZ:  Or thereafter.
13    Q.     BY MR. KATZ:  Now, by the way, let me go through this
14    first, and I'll go back to the documentation we have here.
15    And then the next page, page 5 of your CATS, that was part of
16    the treatment history that's shown; correct?
17    A.     It looks like it.
18    Q.     As is page 6?
19    A.     Yes.
20    Q.     And after all these pages, there's a "pause" at the
21    bottom, isn't there?
22                THE COURT:  The word "pause" is written.  Is that what
23    you mean?
24                MR. KATZ:  Yes.  The word "pause" is printed out.
25                THE COURT:  Do you see that?
```

1              THE WITNESS:  Oh, yeah.  Okay.

2              THE COURT:  Let me ask something.  What's the

3    significance of the categories?  Do you know what "code"

4    means?

5              THE WITNESS:  I think the code is the provider.  I

6    think the jail is 80.

7              THE COURT:  When you say "I think," you're not

8    intimately familiar with this system?

9              THE WITNESS:  Well, it's been a few years since I've

10   used it.

11             THE COURT:  What does "C.C." mean; do you know?  If

12   you don't, that's fine.

13             THE WITNESS:  I don't.

14             THE COURT:  Okay.  How about "THERPT"?

15             THE WITNESS:  I don't remember.

16             THE COURT:  "DUR"?

17             THE WITNESS:  Where are you looking?

18             THE COURT:  Right across the categories.

19             THE WITNESS:  On what page?

20             THE COURT:  I'm looking at page 4.

21             It says "treatment history."  Right?

22             THE WITNESS:  Right.

23             THE COURT:  And then there's a date.

24             THE WITNESS:  Code would be the provider.  Like I

25   think 10 is the jail.

1          THE COURT:  Okay.  "C.C."?

2          THE WITNESS:  I can't remember what that is.

3          THE COURT:  Okay.  Next category.

4          THE WITNESS:  I can't remember that one.

5          THE COURT:  "DUR"?

6          THE WITNESS:  I can't remember that one either.

7          THE COURT:  All right.  "A.S."?

8          THE WITNESS:  No.

9          THE COURT:  "LOC"?

10         THE WITNESS:  No.

11         THE COURT:  That's the location probably.

12         "GRP"?

13         THE WITNESS:  No.

14         THE COURT:  "MCARE," do you know what that means?

15         THE WITNESS:  No.

16         THE COURT:  Do you know what "U" is?

17         THE WITNESS:  No.

18         THE COURT:  Okay.  Mr. Tyler, is there somebody that

19  knows what these categories mean?

20         MR. TYLER:  There may be.  I mean --

21         MR. KATZ:  One of our witnesses is going to testify to

22  the details of the CATS.  We did considerable discovery on

23  this, your Honor.

24         THE COURT:  Okay.  So someone does know.

25         MR. KATZ:  Oh, yes, of course.

1              THE COURT:  Okay.

2              MR. TYLER:  I mean there's somebody from the county

3      who was deposed, Uma Zykofsky or something like that.

4              MR. KATZ:  If I might continue.

5              THE COURT:  Go ahead.

6      Q.      BY MR. KATZ:  And then the eighth page, that's the

7      last page of the CATS; correct?

8              THE COURT:  We're now on Court Exhibit 2, page 8;

9      right?

10             MR. KATZ:  Correct.

11             THE COURT:  Okay.

12             THE WITNESS:  That looks like it.

13     Q.      BY MR. KATZ:  And at the bottom of that page, it

14     doesn't say "pause," does it?

15     A.      No.

16     Q.      And there's an item that says "most recent alias filed

17     for this client," and then it says "none," and then it says

18     "master client display."  Correct?

19     A.      Yes.

20     Q.      And the "enter start date" meaning that if you're

21     going to have another one, you put another person's name in

22     after that?  That's the prompt?

23     A.      I don't remember.

24     Q.      But that was the last page of the CATS you printed

25     out; correct?

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    A.      Which exhibit are you talking about?

2    Q.      Your 44 to your deposition.

3            THE COURT:  The blue one.

4            THE WITNESS:  The blue one?

5    Q.      BY MR. KATZ:  It matches the last page of your Exhibit

6    44 to your deposition.

7    A.      Yes.

8    Q.      Now, let me direct your attention back to the -- if

9    you look at the new JPS file, in other words, 30000 series,

10   sir.

11   A.      Okay.

12   Q.      Now, pages 30020 and 30021, the printed portion of

13   those pages are identical; correct?

14   A.      Correct.

15   Q.      So why was it that there was a copy made with your

16   handwriting put on in the file?

17   A.      I don't understand the question.

18   Q.      Well, 30020 and 30021 both match the second page of

19   the CATS printout; correct?

20   A.      Correct.

21   Q.      Why do you have two copies of that page in the file?

22           MR. TYLER:  In the JPS file?

23           MR. KATZ:  Yes, in the JPS file.

24           MR. TYLER:  That would call for speculation on his

25   part.

1            THE COURT:  Overruled.  Do you know why?

2            THE WITNESS:  What's the question again, Mr. Katz?

3    Q.      BY MR. KATZ:  Sure.  First of all, you agree that

4    30020 and 30021 are the same page?

5            THE COURT:  He did already.

6            THE WITNESS:  Correct.

7    Q.      BY MR. KATZ:  So you made some annotations or

8    explanations on one of those; correct?

9    A.      Right.

10   Q.      On 30021?

11   A.      Right.

12   Q.      Did you print out a Xerox copy of page 30020 and then

13   handwrite your note and put that in the file?

14           MR. TYLER:  It's vague.  Notes on a separate sheet?

15           MR. KATZ:  Yes.

16           MR. TYLER:  Make two copies and write on one?

17           MR. KATZ:  Yes.

18           THE WITNESS:  No.

19   Q.      BY MR. KATZ:  Okay.  So do you have any understanding

20   as to who it was who -- first of all, did you make any

21   handwritten notes on any of the other pages of the -- do you

22   know which pages you made handwritten notes on the CATS

23   before you went to see Mr. Singh?

24   A.      I must have made handwritten comments on page 30021

25   before I saw Mr. Singh.  That's why this document is in the

 1   chart, the original chart.  This document was made after the

 2   fact.

 3   Q.     I understand that.  But what I'm asking you, sir, as

 4   you sit here today, do you recall whether or not you made

 5   similar or different annotations or notes on any of the other

 6   seven pages of the CATS?

 7   A.     No.

 8   Q.     You didn't do it or you don't recall one way or the

 9   other?

10   A.     I don't think I did.

11   Q.     Okay.  So you have no understanding as to why it is

12   that the page that you have handwritten notes on is copied

13   and there's a copy of that page without your handwriting on

14   it?  Wait a minute.

15   A.     This copy was made --

16          THE COURT:  No, no.  Just focus on 30020 and 30021.

17          THE WITNESS:  Okay.

18          THE COURT:  We're trying to figure out why there's a

19   clean copy without your notes and why there is a copy with

20   your notes.

21          THE WITNESS:  Oh, okay.  I have no idea.

22   Q.     BY MR. KATZ:  Did you ever remove any documents from

23   that file?

24   A.     No.

25   Q.     Okay.  Do you have any understanding as to who it was

1  who put another set of file punches in the pages we didn't

2  receive, 30017, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 17,

3  and 18, which are the crucial pages?

4       MR. TYLER:  You mean why there's two holes?

5  Q.     By MR. KATZ:  Yes.  Why there are two sets of hole

6  punches in those documents only.

7  A.     I have no idea, but this is my handwriting on 17 as

8  well.  Not on 18.  My handwriting on 22, 24, 25.  I have no

9  idea.

10 Q.     All right.

11 A.     In fact, I didn't remember putting the CATS in the

12 chart in the first place.

13 Q.     The CATS was already in the chart, wasn't it?

14 A.     No.  I must have put them in because it's my

15 handwriting.

16 Q.     Well, so if you put it in, did you make two copies of

17 every page?

18 A.     No.  I would have made one copy of each page that I

19 put in the chart.  There was no reason to make multiple

20 copies.

21 Q.     Okay.

22      THE COURT:  Go ahead.

23      MR. KATZ:  Oh, thank you.

24 Q.     BY MR. KATZ:  Directing your attention to the new JPS

25 documents or the new file, 30017.

1    A.       Got it.

2    Q.       Mr. Tompkins, is any of the handwriting on that page

3    yours?

4    A.       Yes.

5    Q.       Which items on that page are yours?

6    A.       At the top, 7E123, the two asterisks, the LE 28,

7    that's my handwriting.  Down about the middle, CDC J,

8    arrested on 3/4 under the influence.  Court date 3/11.

9    Assault on a peace officer 245(c).  The CATS number at the

10   bottom.  And released 12/22, which must have been the

11   previous year maybe.  That's my handwriting.

12   Q.       All right.  And did you make these handwritten notes

13   all at one time or at various times?

14   A.       Must have been all at one time.

15   Q.       Okay.  Well, sir, when you saw Mr. Singh, he was on

16   the fourth floor; correct?

17   A.       Correct.

18   Q.       Why did you make a note of him being on 7 East 123?

19   A.       He must have been on 7 East at the time I got this.

20   Q.       Well, would it refresh your recollection at all to

21   know that he was on 4 West when you saw him?

22   A.       I know that he was on 4 West when I saw him.

23   Q.       So are you saying that this page 30017 was routed to

24   you specifically as opposed to anyone else at JPS?

25   A.       I can't remember.

1    Q.      So on March 10th, 2008, or certainly before

2    March 14th, you were aware that there had been a request for

3    him to receive psychotropic medications; correct?

4    A.      Correct.

5    Q.      And --

6            THE COURT:  I'm sorry to interrupt.  Would something

7    like this, the Request for Provider Services, would that come

8    to you at that time?  Would you normally be the first person

9    to see that?

10           THE WITNESS:  It would go to our clerical staff, I

11   believe, and then they would route it.  They would put it in

12   the different floors.  At that time we had a floor model.  So

13   this was 7 East.  It would have been in the seventh slot.

14   And then the clinicians, of which I was one, would go grab

15   those out of our floor.  My floor was 4 West and I think 7

16   West at that time.  And we'd pull them out and we'd triage

17   them, prioritize them, and then go see the patients.

18           THE COURT:  So if this was put in on March 10th, is

19   there some indication as to when you first saw it?

20           THE WITNESS:  It would have been after the 10th

21   probably.

22           THE COURT:  Well, I know that.

23           THE WITNESS:  Probably the 11th or 12th.

24           THE COURT:  Was there any indication as to when -- are

25   there any notes?

 1          THE WITNESS:  No, I can't tell.  I think after -- I

 2  don't know if we did it then, but I think later on we started

 3  date and time stamping the referrals so we could have a

 4  better handle on it.

 5          THE COURT:  This is another document you didn't get.

 6  Right, Mr. Katz?

 7          MR. KATZ:  Correct.

 8          THE COURT:  So you had no chance to ask him questions

 9  about this document.

10          MR. KATZ:  That is correct, your Honor.

11          THE COURT:  Okay.  What it your normal practice once

12  you got one of these to follow up immediately?

13          THE WITNESS:  Not immediately.  We'd triage depending

14  on the urgency.

15          THE COURT:  Well, again, we know you didn't see him

16  until the 14th.

17          THE WITNESS:  He was seen by Ms. Severance on the

18  13th.

19          THE COURT:  I'm talking about you.

20          THE WITNESS:  Oh.

21          THE COURT:  Where is my chronology.  He was seen by

22  you after Ms. Champeau.  When did you first see him?

23          THE WITNESS:  On the 14th.

24          THE COURT:  There it is.  Okay.  At 2:15 in the

25  afternoon.

1          THE WITNESS:  Correct.

2          THE COURT:  So are you the person that then directs

3     Ms. Champeau to see him first?

4          THE WITNESS:  No.  Ms. Severance saw him first.

5          THE COURT:  Okay.  But you're aware as of March

6     10th --

7          THE WITNESS:  Right.

8          THE COURT:  -- that there's a Request for Provider

9     Services.

10         MR. TYLER:  That's not exactly correct.  We know this

11    was written on the 10th, not when it was received.

12         THE COURT:  Your practice is, once you see one of

13    these, is to at some point triage within a reasonable period

14    of time, I assume.

15         THE WITNESS:  Right.

16         THE COURT:  Is four days a reasonable period of time?

17         THE WITNESS:  It varied.  Usually if they said they

18    had active psyche meds, we would see them within a day or

19    two.

20         THE COURT:  But you didn't here.

21         THE WITNESS:  No.  And I can't remember why I didn't

22    and why Ms. Severance did unless it was her floor, it was

23    7 East, so I put it in the 7 East box.

24         THE COURT:  Go ahead, Mr. Katz.

25    Q.    BY MR. KATZ:  Do you recognize on page 30017 any other

1    person's handwriting apart from your own as you testified to?

2    A.    Well, the person who filled out the form.

3    Q.    Whose handwriting is that?

4    A.    I don't recognize it.

5    Q.    That's what I'm asking, sir.  So besides your entries,

6    do you know who else's handwriting appears on this?

7    A.    No, I don't.

8    Q.    And just so I'm clear, are you telling us that you

9    would have looked up the CDC note and the CATS number upon

10   your -- this was all done before you ever saw Mr. Singh;

11   right?

12   A.    Right.

13   Q.    And you made these notes before he died?

14   A.    Yes.

15   Q.    Okay.  On page 30018, do you see that?

16   A.    Correct.

17   Q.    Do you recognize whose handwriting that is?

18   A.    No, but I know it's Sami's because she signed on the

19   top right.

20   Q.    All right.  Now, would this referral also have been

21   routed to you?

22   A.    Not necessarily.

23   Q.    Well, I know not necessarily, but let me ask it this

24   way.  Was this item saying "gets crazy without them,"

25   referring to Mr. Singh's medications, did that route to you?

1    A.      No.

2    Q.      How do you know that?

3    A.      Because I don't remember it.

4    Q.      Okay.  And you specifically remember that 30017 routed

5    to you?

6    A.      Well, yes, because it's got my handwriting on it.

7    Q.      Well, sir, you didn't make any of these notations post

8    Mr. Singh's demise to try to get things tidied up?

9    A.      No.

10   Q.      Okay.  When was the last time you looked at

11   Mr. Singh's file?  And when I say his file, I don't mean your

12   personal file.  I mean the JPS chart file.

13   A.      Right after I saw him.

14   Q.      So before he died?

15   A.      Correct.

16   Q.      And you never saw the file after he died?

17   A.      No.

18   Q.      And did anyone ever ask you to -- did anyone go over

19   these documents with you concerning Mr. Singh?

20   A.      No.

21   Q.      Never; correct?

22   A.      Correct.

23   Q.      Did anyone from JPS ever ask you about a progress note

24   by Ms. Severance about her efforts to get help for Mr. Singh

25   after she saw him?

1    A.      Would you restate the question, please.

2    Q.      Sure.  Did anyone ever ask you whether you had

3    considered a memo or progress note from Ms. Severance

4    prepared after she saw him on the 13th regarding her efforts

5    to get additional care for Mr. Singh?

6    A.      I still don't understand the question.

7    Q.      Did you see any progress note from Ms. Severance --

8    A.      No.

9    Q.      You don't know what the rest of the question is, do

10   you?

11   A.      Okay.

12   Q.      Or do you?

13           MR. TYLER:  Argumentative.

14           THE COURT:  Sustained.

15   Q.      BY MR. KATZ:  Did you see a progress note from

16   Ms. Severance referencing her conversations with Dr. Sokolov

17   and Mr. Hendricks regarding Mr. Singh that occurred on the

18   13th of March 2008?

19   A.      I believe I saw it but not until I did the deposition.

20   But I didn't see it during the time frame of when we treated

21   him or when he died.

22   Q.      Is that one of the documents your attorney showed you?

23   A.      Yeah, I believe so.

24   Q.      Okay.  Moving on to page 30022.

25           THE COURT:  Wait.  Look, I don't want to play guessing

1    games here, and we're not here to trick people.  I thought

2    those progress notes don't exist.  Right?

3            MR. KATZ:  I haven't seen them.  I think they exist,

4    but that's a matter of --

5            MR. TYLER:  What he's referring to is a progress note

6    from Ms. Severance that's in the file.  That was produced to

7    him.  That was produced to me.  There's a handwritten

8    progress note from her.

9            THE COURT:  In the JPS file?

10           MR. TYLER:  Yes.

11           THE COURT:  What's the Bates stamp number?

12           MR. TYLER:  That's always been there.  That's what I

13   showed him.  That's what he's referring to.  And he is

14   confused.

15           MR. WILLIAMSON:  I believe it's 30077.

16           THE COURT:  Okay.

17           MR. TYLER:  And that document appears as JP 20029.

18           THE COURT:  I just want to make sure.  So the progress

19   note or the notes are from Ms. Severance, but these don't

20   talk about her conversations with Dr. Sokolov and

21   Mr. Hendricks.  Where are those notes?

22           MR. TYLER:  I've never seen such a note.

23           THE COURT:  Okay.  That's the question he's asking

24   you, Mr. Tompkins.  Ms. Severance had conversations with

25   Dr. Sokolov and Mr. Hendricks and made progress notes on

1    those conversations.  Have you ever seen those progress

2    notes?

3              THE WITNESS:  No.

4              THE COURT:  Okay.

5    Q.     BY MR. KATZ:  Directing your attention to page 30022.

6    And once again, I'm in the Court Exhibit Number 1, the color

7    copy file, Mr. Tompkins.  Do you have that page in front of

8    you, sir?

9    A.     I do.

10   Q.     Is any of the handwriting on that page yours?

11   A.     Yes.

12   Q.     What's your handwriting?

13   A.     The asterisk at the top.  CDC J.  The CATS number.

14   Arrest 3/4.  Under the influence.  Court 3/6.  Released

15   12/22, 10/19, 9/14 and 1989.  245(c), assault with great

16   bodily injury on a peace officer.

17   Q.     And you wrote this information down prior to you

18   seeing Mr. Singh?

19   A.     Correct.

20   Q.     And why were you referencing his court dates that had

21   past when you were reviewing his file for the purpose of

22   doing a suicide assessment?

23   A.     What?

24   Q.     When you were looking at these documents, that was

25   because you were going to do a suicide assessment?

1    A.      No.  This was obviously written probably around the

2    5th or so after he was arrested.

3    Q.      Okay.  So you made these notes on 30022 on or about

4    March 5th or 6th; correct?

5    A.      I would say so.

6    Q.      So then when you had seen Mr. Singh, you had had two

7    previous, at least documentary contacts, involving Mr. Singh;

8    correct?  You'd reviewed several papers on several occasions

9    regarding his condition?

10          MR. TYLER:  Misstates his testimony.

11          THE COURT:  You put three questions in there,

12   Mr. Katz.

13   Q.      BY MR. KATZ:  I'm sorry.  So when you saw Mr. Singh on

14   the 13th, that's the first time you personally face-to-face

15   saw him; correct?

16   A.      Correct.

17   Q.      But the first time you received any paperwork

18   concerning Mr. Singh's need for psychiatric attention was on

19   or about March 5th, 2008?

20   A.      I believe so.

21   Q.      And you put the CATS number in.  Would you have

22   printed out a CATS printout at that time?

23   A.      Not necessarily.

24   Q.      Did you?

25   A.      I don't remember.

1    Q.      Okay.  And at that time you knew he'd been referred

2    for a psychiatric referral; correct?

3    A.      Yes, by virtue of that yellow document, page 22.

4            THE COURT:  Can I ask a question?  Did you know he had

5    been over to UC Davis?

6            THE WITNESS:  When I looked him up to see how I was

7    going to triage him, I looked him up on the JIMS, and it said

8    "outside doctor."

9            THE COURT:  Okay.

10           THE WITNESS:  And so I knew he was out of the jail and

11   so he couldn't be seen.  Now, I later knew that he was at

12   UC Davis.  I don't remember how I learned that he was at

13   UC Davis because all the JIMS says is "outside doctor."

14           THE COURT:  Okay.  And then prior to you seeing him on

15   the 14th, did you try to contact or find out who that outside

16   doctor was?  Did you try to get any records?

17           THE WITNESS:  No.

18           THE COURT:  Okay.  Go ahead, Mr. Katz.

19   Q.      BY MR. KATZ:  All right.  So that was your first --

20   and then you also received the document dated at least March

21   the 10th regarding his need for attention?

22   A.      Yes.

23   Q.      And when you received that, because of where it was

24   from, was it your assumption that he had returned -- your

25   understanding is he had returned to the jail on the 10th;

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

```
1    right?  He was back at the jail?

2    A.      I believe so.

3    Q.      Page 30024, that's your handwritten note; is that

4    correct?

5            MR. TYLER:  What page are we looking at?

6            THE COURT:  30024.

7            MR. KATZ:  30024.

8            THE WITNESS:  Correct.

9            THE COURT:  That means major mood disorder?

10           THE WITNESS:  Major depressive disorder.

11           THE COURT:  Major depressive disorder.  Okay.

12   Q.      BY MR. KATZ:  And you would have made that notation

13   before you physically saw Mr. Singh on the 14th?

14   A.      Yes.

15   Q.      Okay.  And the handwritten notes on page 30025, are

16   those your handwritten notes?

17   A.      Correct.

18   Q.      And what do those three entries or notations stand

19   for?

20   A.      The numbers are from the Diagnostic and Statistical

21   Manual of Mental Disorders, DSM.  And 303.9 refers to alcohol

22   dependence.  The 296.8 is mood disorder.  And the 303.00 is

23   alcohol intoxication.

24   Q.      And why were you making these notes before you went to

25   see him?
```

1    A.      I usually did that before I saw any patient.

2    Q.      But in this case you were looking at -- you were

3    making notes regarding what happened in 2005 and 2006;

4    correct?

5    A.      Correct.

6    Q.      And then on page 2004, you made a note regarding the

7    2004 diagnosis?

8    A.      Say again.

9            THE COURT:  Say that again.

10   Q.      BY MR. KATZ:  On page 30024, the line is to the 2004

11   diagnosis?

12   A.      Yes.

13           MR. KATZ:  I don't have any other questions on this

14   issue.

15           THE COURT:  Okay.

16           MR. TYLER:  This issue or this witness?

17           MR. KATZ:  Well, this witness on this issue.

18           THE COURT:  Mr. Tyler, did you want to ask any

19   questions?

20           MR. TYLER:  Two.

21           THE COURT:  Go ahead.

22                            CROSS-EXAMINATION

23   BY MR. TYLER:

24   Q.      The last document we looked at which is JP 30025, not

25   only did you make notations about diagnoses in 2005 and 2006,

 1    but if you look down, the alcohol dependence is a diagnosis

 2    code that apparently refers to somebody's impression about a

 3    month and a half earlier.  That's January 28th, 2008.  Is

 4    that correct?

 5    A.      Correct.

 6    Q.      And just to clarify, the notes with your handwriting

 7    that are in the chart, you didn't make a separate copy; you

 8    didn't make two copies and put a blank one in the chart and

 9    then write on another.  You just wrote on the ones you

10    produced.  So somebody else did.

11          THE COURT:  That's not a question.  That's a

12    statement.  Do you have a question for the witness?

13    Q.      BY MR. TYLER:  Yes.  Did you make a separate copy of

14    the document that's blank and then put that in the file?

15    A.      No.

16          MR. TYLER:  Thank you.

17          THE COURT:  Okay.  All right.  You may step down.

18          THE WITNESS:  Thank you.

19          THE COURT:  Let's take a very short break.  Let's come

20    back at 11:00.  Who do you want to call next?

21          MR. KATZ:  We would call Mr. Hendricks next, your

22    Honor.

23          THE COURT:  Okay.  Mr. Hendricks, you're next.

24          (Recess taken.)

25          MR. TYLER:  Your Honor, can I take him back for just a

```
1    minute?
2            THE COURT:  You can.  Sure.
3            MR. TYLER:  I may?
4            THE COURT:  Yeah.
5            MR. TYLER:  Thank you.
6            THE COURT:  Your clients, by the way, are free to sit
7    at counsel table if you guys want.
8            MR. TYLER:  Oh, they hate me.
9            THE COURT:  That's why it's better to be a judge than
10   a lawyer.
11           Go ahead.
12           We're going to recall Mr. Tompkins.  Just come back
13   up, Mr. Tompkins, if you would.
14           All right.  Mr. Tyler, go ahead.
15           MR. TYLER:  Thank you.
16                        FURTHER CROSS-EXAMINATION
17   BY MR. TYLER:
18   Q.    It's actually Dr. Tompkins, is it not?
19   A.    It is.
20   Q.    And you are a licensed psychologist?
21   A.    I am.
22   Q.    Ph.D.?
23   A.    Ed.D.
24   Q.    I would like to draw your attention, first of all --
25           THE COURT:  What's the Ed.D, a doctorate in what?
```

1            THE WITNESS:  Education, counseling, psychology.

2            THE COURT:  Okay.

3    Q.      BY MR. TYLER:  I'd like to draw your attention first

4    to what's been marked as JP 30018.

5            THE COURT:  And again, this is in Court Exhibit 1.  So

6    go ahead.

7            MR. TYLER:  Thank you.

8    Q.      BY MR. TYLER:  And this is the statement or the

9    document that says "Sami" at the top?

10   A.      Correct.

11   Q.      Did Sami work day shift or night?

12   A.      Day.

13           THE COURT:  Does Sami have a last name?

14           MR. TYLER:  I'm sure she does.

15           THE COURT:  Do you know it?

16           THE WITNESS:  It was an Italian name, wasn't it?

17           THE COURT:  Do you know?

18           THE WITNESS:  I don't remember.

19           THE COURT:  Okay.

20   Q.      BY MR. TYLER:  So when this says 1:00 o'clock, it

21   would have to be done during the middle of the day?

22   A.      Pardon me?

23   Q.      When she says 1:00 o'clock, the only time that she's

24   at the jail is during the daytime?

25   A.      Correct.

1    Q.     So that's --

2           THE COURT:  He can't answer that.  I mean Sami's the

3    only one that can answer that.

4           MR. TYLER:  Okay.

5           THE COURT:  That's your best guess; right?

6           THE WITNESS:  Yes.

7           THE COURT:  Okay.

8           THE WITNESS:  I know that she worked the day shift.

9           THE COURT:  Okay.

10   Q.     BY MR. TYLER:  Drawing your attention back to the

11   preceding page which is the 30017, this has your handwriting

12   on it.

13          Is this requesting that he be seen by a psychiatrist?

14          THE COURT:  Well, again, he didn't fill out the form.

15          MR. TYLER:  No, but he interpreted the form when he

16   would pick it up.

17          THE WITNESS:  This form says the specialty clinic

18   requested is JPS, Jail Psych Services.

19   Q.     BY MR. TYLER:  And what is the service that's being

20   requested?

21   A.     To have a clinician see him because he contended that

22   he had a history of psych meds you can see written in there.

23   Q.     Now, you put various handwriting on this document;

24   correct?

25   A.     Correct.

1    Q.      And is it your belief that you were doing some type of

2    triage function at this point?

3    A.      Yes.

4    Q.      Mr. Singh was not seen that day.  We know that.

5    A.      Correct.

6    Q.      Why did you not go see Mr. Singh on that day?

7    A.      It is likely that I was the triage person that day,

8    and my job was to go through the referrals and make decisions

9    on their priority.  And so this probably wasn't a top

10   priority.  The top priority we call "must sees."  And that

11   would be someone, for example, who is suicidal or gravely

12   disabled.  And so it's very likely that I just put this in

13   somebody's box but did not deem it someone that needed to be

14   seen that day, workload depending.

15   Q.      For a person who was not a, as you put it, a "must

16   see," what sort of time frame are we talking about as you

17   understood JPS operations at the time that they would

18   actually be seen?

19   A.      Within a week, within seven days.

20   Q.      And that was the basic rule of thumb?

21   A.      Right.

22           MR. TYLER:  Thank you.  Nothing further.

23           MR. KATZ:  Nothing further on the issue we're dealing

24   with this morning.

25           THE COURT:  Okay.  All right.  Mr. Hendricks.

1                        PAUL EDWARD HENDRICKS,

2      a witness called by the Plaintiff, having been first duly

3      sworn by the Clerk to tell the truth, the whole truth, and

4      nothing but the truth, testified as follows:

5                 THE WITNESS:  I do.

6                 THE CLERK:  State your full name for us, please, and

7      spell your last name.

8                 THE WITNESS:  Paul Edward Hendricks,

9      H-E-N-D-R-I-C-K-S.

10                THE COURT:  All right.  Mr. Katz, go ahead.

11                MR. KATZ:  Thank you.

12                          DIRECT EXAMINATION

13     BY MR. KATZ:

14     Q.    Is it okay if I address you as Mr. Hendricks?

15     A.    Sure.

16     Q.    Okay.

17                THE COURT:  You're a registered nurse; right?

18                THE WITNESS:  Correct.

19                THE COURT:  Okay.

20     Q.    BY MR. KATZ:  And at the time of Mr. Singh's death,

21     you were the clinical director?

22     A.    Correct.

23     Q.    Is it correct that after learning of Mr. Singh's death

24     the evening of March 14, 2008, you directed nurse Donna

25     Champeau to get the chart together so it can be reviewed?

1    A.      Correct.

2    Q.      And you didn't tell her to remove anything from the

3    chart; correct?

4    A.      I did not tell her to remove anything.

5    Q.      And your intent was that nothing would be added to the

6    chart prior to its review; correct?

7    A.      Correct.

8    Q.      And you physically kept the chart in your office;

9    correct?

10           THE COURT:  When you say the chart, do you mean the

11   JPS file that's marked as Court Exhibit 1?

12   Q.      BY MR. KATZ:  Thank you, your Honor.  Yes.  The file

13   that was marked as Court Exhibit Number 1, that folder was

14   kept in your office after March 14th; correct?

15   A.      It was kept in a shared office.

16   Q.      And shared between yourself and Dr. Sokolov?

17   A.      That's correct.

18   Q.      And you two kept it in that office; correct?

19   A.      That's where I remember it being, yes.

20   Q.      Well, at what point did it leave your office?

21   A.      It may have left when it was being copied.  I don't

22   remember it leaving my office other than if somebody would be

23   reviewing it.  Dr. Sokolov may review it.  We may go to

24   another office when we're reviewing it.

25   Q.      So apart from when somebody physically picked the file

 1    up to make a copy or to take it to a meeting, the file stayed

 2    in your office; correct?

 3    A.      It stayed in that office.  I switched offices several

 4    years ago, and the file was sometimes in my other office

 5    which was next door.

 6    Q.      When did you switch offices?

 7    A.      I don't remember the exact date.  It was about two

 8    years ago.

 9    Q.      Okay.  Well, for the first two years after Mr. Singh

10    passed, the file was kept in your joint office; correct?

11    A.      That's correct.

12    Q.      After you switched offices, did the file go with you

13    or did it stay in the office that it had been in?  What

14    happened to the file?

15    A.      When it was being stored, it stayed in Dr. Sokolov's

16    office.

17    Q.      So after approximately 2010, it was Dr. Sokolov who

18    had exclusive control over the file physically?

19    A.      He didn't have exclusive control.  There's other

20    people who have access to the office.

21    Q.      And was it kept in a locked cabinet or on top of a

22    desk?  Where was it physically kept within the office?

23    A.      It was kept in a filing cabinet.

24    Q.      Locked or unlocked?

25    A.      It was unlocked.

1    Q.      Okay.  And what files were kept in that cabinet?

2    A.      There's some employee records in that cabinet.  There

3    are some files in that cabinet, other patient files in that

4    cabinet.

5    Q.      And employee records, that's not the type of thing

6    that other employees would have access to; correct?

7    A.      Right.

8    Q.      Is that true?

9    A.      Correct.

10   Q.      So this was a file cabinet that was off limits in

11   general to employees; correct?

12   A.      Correct.

13   Q.      Other than Dr. Sokolov?

14   A.      Other than other supervisors too.

15   Q.      So yourself and Dr. Sokolov, Dr. Hales, you would all

16   have access physically to the chart?

17   A.      Correct.

18   Q.      Okay.  And when you returned to work, you returned to

19   work the Monday following Mr. Singh's death which would have

20   been March 17, 2008; correct?

21   A.      That's correct.

22           THE COURT:  The 14th was a Friday, Mr. Katz?

23           MR. KATZ:  It was, your Honor.

24           THE COURT:  Okay.

25   Q.      BY MR. KATZ:  And at that time you went through the

1   paper chart; correct?

2   A.      At that time I looked at the paper chart, yes.

3   Q.      And you generally recollect also reviewing the paper

4   chart with Dr. Hales at a meeting; correct?

5   A.      I generally -- I'm sorry.  What's your question?

6   Q.      You were at a meeting in which the chart was reviewed

7   with Dr. Hales present; correct?

8           THE COURT:  Is the paper chart the JPS file?

9           MR. KATZ:  Yes.

10          THE COURT:  Why don't we call it the JPS file.

11  Q.      BY MR. KATZ:  With the JPS file.

12  A.      I had a meeting with Dr. Hales, yes.

13  Q.      And you had the JPS file there, didn't you?

14  A.      I believe so, yes.

15          THE COURT:  We're still on the 17th of March 2008?

16          MR. KATZ:  Shortly thereafter.  I'm talking about the

17  custody physically of the file in my line.

18  Q.      BY MR. KATZ:  And when you put that file in your

19  office, is it correct that you assumed that there would be

20  litigation?

21  A.      I didn't assume there would be litigation.

22  Q.      Well, did you testify that you assumed it could

23  happen?

24  A.      It could happen.

25  Q.      But that was one of the reasons you took control of

1    the file, wasn't it?  And if it refreshes your recollection,

2    you might look at your transcript starting on page 51, line

3    15.

4    A.      My transcript?

5            MR. TYLER:  Why doesn't he let him testify as opposed

6    to -- well, he can read it.  He's a party.  Go ahead.

7            THE COURT:  Ask your question again, Mr. Katz.

8            MR. KATZ:  Sure.

9    Q.      BY MR. KATZ:  You took control of that file; correct?

10           THE COURT:  You've already established that.

11   Q.      BY MR. KATZ:  And you don't do that with everyone's

12   file who is a JPS person; correct?

13   A.      When people die in custody, I usually do, yes.

14   Q.      And in this instance when he died in custody, you knew

15   that there was a significant chance that there would be

16   litigation regarding Mr. Singh's death; correct?

17   A.      I didn't know there would be a significant chance.  I

18   thought there might be, yes.

19   Q.      And, in fact, you assumed that, didn't you?  Wasn't

20   that your assumption?

21   A.      My assumption?  My assumption is it could happen, yes.

22   Q.      And your recollection is that -- by the way, you're

23   the one who told Mr. Tyler that he didn't have portions of

24   the file; is that right?

25           THE COURT:  Hang on.  Are we getting into

1   attorney-client privilege or not?

2           MR. TYLER:  Well, we are, but I think I've waived that

3   conversation because I told you about it and I told Mr. Katz

4   about it last Thursday.

5           THE COURT:  As long as you're okay and the record's

6   clear.

7           MR. TYLER:  Yes, I'm okay with that.

8           THE COURT:  I'll allow that.  Go ahead.

9           THE WITNESS:  So what's the question?

10  Q.      BY MR. KATZ:  You're the one who told Mr. Tyler that

11  they were missing parts of the file; correct?

12  A.      I told Mr. Tyler that the document he was talking to

13  me about on the phone was in the record.  It was a single

14  document.

15  Q.      Did you tell Mr. Tyler that whoever copied the file

16  had failed to copy the documents on the left side?

17  A.      I told Mr. Tyler that what I had was not what he had.

18  I don't know what happened.

19  Q.      Your testimony today, sir, is you did not tell

20  Mr. Tyler that whoever copied the file failed to copy one

21  side of the file?

22  A.      I don't remember the conversation that way, no.

23  Q.      Okay.  In terms of the CATS, is it correct that part

24  of the reason the CATS is in the file is because you're

25  interested in the treatment for continuity-of-care issues?

 1            THE COURT:  Continuity of what?

 2            MR. KATZ:  Continuity of care.

 3            THE WITNESS:  The reason the CATS is in the file?

 4    Q.    BY MR. KATZ:  That's part of the purpose, yes.

 5    A.    The reason the clinicians look at the CATS and put it

 6    in the file is for continuity of care, yes.

 7    Q.    Okay.  And at your deposition -- first of all, you

 8    didn't recall at your deposition whether or not there was a

 9    CATS printout in the file?

10            THE COURT:  What page?

11            MR. KATZ:  Page 79, line 8, through page 80, line 7.

12            THE COURT:  Page 79.  Go ahead.  Line what?

13            MR. KATZ:  79, line 8, through page 80, line 7.

14            THE WITNESS:  At my deposition, I didn't recall?  Is

15    that what you're asking me?  I don't have the deposition in

16    front of me.

17    Q.    BY MR. KATZ:  You do actually.

18    A.    I do?

19            MR. TYLER:  Yes.

20            MR. KATZ:  Yes.

21            THE WITNESS:  I have Mike Tompkins' deposition.

22    Q.    BY MR. KATZ:  I think you have yours in front of you.

23    If you look at the transcript right there under the blue.

24    A.    This is my deposition?

25    Q.    Is that your name?

1   A.      Yeah.

2   Q.      Okay.

3           THE COURT:  Go to page 79.

4           THE WITNESS:  Okay.  Yeah, I testified that I didn't

5   remember seeing one, but there could have been one.

6   Q.      BY MR. KATZ:  And at the time of your deposition,

7   you'd looked at that file how many times?

8   A.      Several.

9   Q.      Okay.  And the portion of the file that concerned

10  Mr. Singh's March 2008 incarceration, that was a total of

11  about 30 pages, wasn't it?

12  A.      I don't remember the number of pages.

13  Q.      An eight-page CATS printout would have been a

14  significant portion of that file, wouldn't it?

15          MR. TYLER:  Objection.  It's vague and ambiguous as to

16  significant portion.

17          THE COURT:  Rephrase.

18  Q.      BY MR. KATZ:  Sure.  At least a quarter of those pages

19  would have been -- the file would have been the CATS

20  printout; correct?

21  A.      No.

22  Q.      How much space would the CATS printout have been?

23  A.      I don't know how many pages the CATS printout was.

24  Q.      Well, you've looked at the file, haven't you?

25  A.      Recently, I did look at the file.  I didn't count the

1    CATS pages.

2    Q.      Well, you looked at the CATS printout a couple of days

3    before your deposition after being provided that by your

4    attorney; correct?

5    A.      I looked at what my attorney provided me, yes.

6    Q.      And the CATS printout that you were provided, that was

7    an eight-page printout, wasn't it?

8    A.      I don't remember the number of pages.

9    Q.      Was the printout that you looked at the same printout

10   that was used as an exhibit for both Ms. --

11          MR. TYLER:  Objection.  Are we talking about a

12   printout that he referred to in his deposition?

13          MR. KATZ:  Yes.

14          MR. TYLER:  Can I get a page and line on that?

15          THE COURT:  Plaintiff's Exhibit 55.  It's at the back

16   of the deposition.  Okay.  So I know that there was an

17   exhibit marked for his deposition.

18          What's your question, Mr. Katz?

19   Q.      BY MR. KATZ:  Was that the first time you'd seen a

20   CATS for Mr. Singh?

21          THE COURT:  It's marked as an exhibit to your

22   deposition.

23          THE WITNESS:  55.  Yeah, I've got it.

24          THE COURT:  And the question is does that --

25   Q.      BY MR. KATZ:  Was that the first time you had seen --

 1    when you saw that document, had you seen the CATS before for

 2    Singh?

 3    A.       When I was shown by my attorney?

 4    Q.       Yes.

 5    A.       This is the first time I remember seeing it, yes.

 6    Q.       Okay.

 7             THE COURT:  Well, so let's clarify.  So you don't

 8    remember seeing a CATS printout in the file in March of 2008

 9    right after his suicide?

10             THE WITNESS:  I don't remember seeing it, no.  But

11    it's five years ago.  It was three years from the deposition.

12    I don't remember whether the CATS data sheet was in the file

13    or not at that time.

14             THE COURT:  I guess the question is wouldn't the CATS

15    data sheet be somewhat significant to you if you're at that

16    point reviewing a suicide?

17             THE WITNESS:  At that point, no, it wasn't.  I didn't

18    feel it was significant, no.

19             THE COURT:  Why not?

20             THE WITNESS:  Well, again, I was reviewing the

21    clinical record to see what the clinicians had said, what

22    they had done, when did they go out and see Mr. Singh, and

23    what was their response.  That's what I had looked at in that

24    period of time.

25             THE COURT:  But you're doing a review of a suicide at

1    that point, March 17th; right?  Don't you want to know?

2           THE WITNESS:  What his CATS data sheet says?

3           THE COURT:  Yeah.

4           THE WITNESS:  No.  I didn't look at it.  I don't

5    remember looking at the CATS data sheet.

6           THE COURT:  I'm not asking you whether you remember

7    looking at it.  I'm asking you now isn't that a fairly

8    significant document?

9           THE WITNESS:  The CATS data sheet is an important

10   document that the clinicians use before they go out to see

11   patients, yes.

12          THE COURT:  Well, someone reviewing what the

13   clinicians did would normally review that; right?  Wouldn't

14   that be one of the first things you'd do, is you'd want to

15   know the person's treatment history?

16          THE WITNESS:  Again, I looked at the history that was

17   in the record.

18          THE COURT:  I'm not asking you what you did.  I'm now

19   asking you, based on your experience, isn't that something

20   that would be significant?  Isn't that a significant

21   document?

22          THE WITNESS:  The CATS data can be a significant

23   document, yes.

24          THE COURT:  Okay.  Go ahead, Mr. Katz.

25   Q.     BY MR. KATZ:  So do you ever remember, prior to taking

1     the witness stand today, looking at the CATS printout or the

2     portion of the CATS printout that is contained in the JPS

3     file, Court Exhibit 1?

4            THE COURT:  He said no to that.

5     Q.     BY MR. KATZ:  After you took the file, did you direct

6     anyone to make a copy of a portion of the CATS and put it in

7     the file?

8     A.     No.

9     Q.     Did you direct that any portion of the CATS printout

10    that was in the file be removed?

11    A.     No.

12    Q.     Did you ever disassemble portions of the file and

13    create another file regarding Mr. Singh that is now included

14    in Court Exhibit 1?

15    A.     No.

16    Q.     Do you have any understanding as to why documents that

17    we didn't have were apparently two-hole punched on another

18    occasion?  And specifically if you have the copy of the green

19    file in front of you, I would refer specifically to pages

20    30017, 18, 19, 20, 21, 22, 23, 24, 25, 26 and 27.

21    A.     I don't know why they're double punched, no.

22           THE COURT:  You didn't do that though; right?

23           THE WITNESS:  I did not.

24           THE COURT:  Okay.

25    Q.     BY MR. KATZ:  And for the first two years after

1  Mr. Singh's death, it was in the office that you shared with

2  Mr. Sokolov?

3  A.      Dr. Sokolov.

4  Q.      Dr. Sokolov.  I'm sorry.  And then after that, it

5  stayed in Dr. Sokolov's office?

6  A.      It was kept in the file cabinet in his office, yes.

7  Q.      Now, on April 14th of 2008, the file was in the office

8  that was maintained by yourself and Dr. Sokolov; correct?

9  A.      I'm sorry.  What's the date now?

10  THE COURT:  April 14, 2008.

11  Q.      BY MR. KATZ:  April 14, 2008.

12  A.      I don't remember that date, but yeah, I assume so.

13  Q.      Well, that was --

14  A.      That was about a month.

15  Q.      Yes.

16  A.      Yes.

17  Q.      Okay.  Was there any discussion that you participated

18  in with any person regarding what pages would be copied and

19  released out of Mr. Singh's JPS file?

20  A.      I don't remember a discussion, no.

21  THE COURT:  Did Vernessa Lauria work for you?

22  THE WITNESS:  Yes.

23  THE COURT:  What was her portion?

24  THE WITNESS:  She was an administrative assistant.

25  THE COURT:  To you and Dr. Sokolov?

1            THE WITNESS:  To me and Dr. Sokolov.

2            THE COURT:  Okay.

3    Q.      BY MR. KATZ:  And was it typical for requests for

4    medical releases to go to the psychiatrist?

5            Was that the typical routing for someone who made a

6    request for a copy of their JPS records?  Is that something

7    that a doctor would personally review?

8    A.      Sometimes.  I'm trying to remember the exact sequence.

9    But they would come in and Vernessa would get the release,

10   and she would review it sometimes with me, sometimes with

11   Dr. Sokolov.  Some of them she did on her own.

12   Q.      Well, how was it determined which times she would do

13   it on her own and which times it would be in consultation

14   with either yourself or Dr. Sokolov?

15           MR. TYLER:  It may call for speculation on his part,

16   but --

17           THE COURT:  Overruled.  Go ahead.  You can answer.

18           THE WITNESS:  It may depend on where the request was

19   coming from.

20   Q.      BY MR. KATZ:  Okay.  Well, and what about if the

21   request was from an attorney's office?

22   A.      A request from an attorney's office, she would

23   probably review it with one of us to let us know that there

24   had been a request for the records.

25   Q.      And would one of you review what would be given in

 1    response to that request?

 2    A.     We would review the request and tell her if it was

 3    okay to release the information.

 4    Q.     Well, would you tell her which information to release?

 5    A.     Whatever was contained in the release of information.

 6           THE COURT:  I think the question more is once she

 7    copies the documents to be released, does she review them

 8    with either you or Dr. Sokolov before she actually mails them

 9    out?

10           THE WITNESS:  No.  Not routinely, no.

11    Q.     BY MR. KATZ:  Ever?  Did she ever review those with

12    you?

13    A.     Not that I remember, no.

14    Q.     Okay.  When is the first time you became aware that

15    the attorneys in this case did not have the complete JPS

16    chart, Exhibit 1, Court Exhibit 1?  When did you first

17    realize that?

18    A.     When I was talking to the attorney on -- I believe it

19    was Thursday.

20    Q.     So that's the first time you had an inkling?

21           THE COURT:  He said yes.  You don't have to keep

22    repeating the answer.

23           MR. KATZ:  Okay.  That's fine.  I don't have any

24    additional questions of this witness on this issue.

25           THE COURT:  Questions, Mr. Tyler?

1             MR. TYLER:  No.

2             THE COURT:  You may step down.

3             Who do you want next?

4             MR. KATZ:  I believe they were going to bring a

5     custodian of records, your Honor.

6             THE COURT:  Is there a custodian here, Mr. Tyler?

7             MR. TYLER:  There is no -- well, then I'll put

8     Mr. Hendricks on the stand.  There is no -- actually, I'll

9     make an offer of proof.  There is no custodian of records at

10    present because, for the last two or three years, the

11    entirety of the records have become the property of

12    Correctional Health Services, an arm of the county.  It's

13    when they flipped over to a complete electronic chart.  And

14    since then, we don't have a custodian.  They have the

15    records, and they're their records.

16            THE COURT:  So where has the original file been?  In

17    Dr. Sokolov's office?

18            MR. TYLER:  Well, Mr. Hendricks' office, I think, is

19    where I found it.

20            MR. KATZ:  Why wasn't that file turned over with the

21    others then if they all became property of Correctional

22    Health Services?

23            THE COURT:  What?  The JPS file?

24            MR. KATZ:  Yes.

25            THE COURT:  It sounds like they did everything

 1    electronically.  They're all now scanned in.  Right?

 2            MR. TYLER:  Yes.  Everything's --

 3            MR. KATZ:  Right.

 4            THE COURT:  Everything is scanned in.

 5            MR. KATZ:  Right, but -- in any event --

 6            THE COURT:  I think the question is why didn't

 7    Correctional Health return it to Mr. Hendricks and

 8    Dr. Sokolov?

 9            MR. TYLER:  They never had it because it's sitting in

10    the file cabinet.

11            THE COURT:  What do you mean they never had it?

12            MR. TYLER:  Correctional Health Services.

13            THE COURT:  They had to have it to scan in the

14    records; right?

15            MR. TYLER:  No.  No.  We had the file.  And all I'm

16    saying is after we took possession of the file which you have

17    there, my understanding is that the Correctional Health

18    Services took over complete control of JPS files.  And since

19    it's gone to an all electronic document, they are the

20    custodian of records.  You wanted somebody to come in and

21    talk about how these things get produced, and I was told that

22    now --

23            THE COURT:  It sounds to me, though, this original

24    file, this Court Exhibit 1, has been in and out of that

25    office a few times for copying.

1          MR. TYLER:  It was certainly -- Vernessa certainly

2     took it to the copy machine to make the copy for Mr. Katz.

3     It certainly went to the copy machine to make a slightly

4     different copy of the -- but also incomplete copy of the

5     records to me.

6          THE COURT:  There was a review that went on with

7     Dr. Hales, Dr. Sokolov, and Mr. Hendricks.

8          MR. TYLER:  Yeah.  Dr. Hales testified that yes, the

9     Wednesday afterwards, which would be --

10         THE COURT:  Obviously, the file must have been there

11    during their review.

12         MR. TYLER:  Assumedly, sure.  They have all testified

13    that the file, that, you know, they had the file, and they

14    talked about it and did their review.

15         THE COURT:  My question is what was in the file,

16    though, at that point during their review?

17         MR. TYLER:  Well, I understand that's the question

18    that --

19         THE COURT:  That's a question I have too.  I mean how

20    can you not remember looking at a CATS?  And there are a lot

21    of CATS documents in this file, not just one.

22         MR. TYLER:  Well, I think Mr. Hendricks just answered

23    that.  I mean what they were looking at is the clinicians'

24    actions in there.  The CATS history, it's salient in certain

25    regards, but that was not the focus of their study at the

```
 1    time.  They were looking at the quality of the clinicians'

 2    actions.  And Severance, Champeau, and Tompkins, in

 3    particular, the three people that had seen Mr. Singh, they

 4    wanted to determine whether those actions came up to snuff.

 5            THE COURT:  Sure.  And we now know that there's

 6    handwriting on some of these CATS documents which indicated

 7    that at least Mr. Tompkins knew that there were some DSM

 8    diagnoses that were made and that he was aware of.  I'll save

 9    my questions for the argument phase.

10            Call your next witness.

11            MR. GEORGE JR.:  Gregory Sokolov, your Honor.

12            THE COURT:  Dr. Sokolov, you may take the stand.

13                        GREGORY SOKOLOV,

14    a witness called by the Plaintiff, having been first duly

15    sworn by the Clerk to tell the truth, the whole truth, and

16    nothing but the truth, testified as follows:

17            THE WITNESS:  I do.

18            THE CLERK:  If you'll state your full name and spell

19    your last name for the record.

20            THE WITNESS:  Gregory Sokolov, S-O-K-O-L-O-V.

21            THE COURT:  All right.  Mr. Katz, go ahead.

22            MR. KATZ:  Mr. George actually will be doing the

23    examination of Dr. Sokolov, your Honor.

24            THE COURT:  George, Jr.?

25            MR. KATZ:  George, Jr.
```

1                          DIRECT EXAMINATION

2    BY MR. GEORGE JR.:

3    Q.      Dr. Sokolov, my name is Joseph George, Jr., one of

4    attorneys representing the Singh children.  And I introduce

5    myself to you.  I was not present at your November 15th

6    deposition or your December 8th deposition.  Both transcripts

7    are to your right.

8    A.      Good afternoon.

9    Q.      Good afternoon.  You've been present obviously for

10   both Dr. Tompkins' and Mr. Hendricks' sworn testimony this

11   morning?

12   A.      I have.

13   Q.      In March of 2008, you were the medical director at

14   Jail Psychiatric Services?

15   A.      That's correct.

16   Q.      You learned of Baljit Singh's death, his successful

17   suicide on March 14th?

18   A.      I did.

19   Q.      You were not physically present at the jailhouse that

20   day.  True?

21   A.      I was not.

22   Q.      You returned to work on March 17th, 2008?

23   A.      That's correct.

24   Q.      On or about March 17th, you took physical possession

25   of the JPS file that's been marked the Court's Exhibit Number

1     1?

2     A.      That's correct.

3     Q.      And that happened on March 17th?

4     A.      Yes.

5     Q.      All right.  Continuously from March 17th to the

6     present, you have had physical custody of the file?

7     A.      Well, the custody of the file or, better yet, the

8     physical location of the file has been exclusively in a

9     filing cabinet in my office.

10    Q.      And one of the reasons why you took custody of the

11    file was for safekeeping?

12    A.      Typically, the reason why we would sequester a file

13    like this is if there's some sentinel event; a death in

14    custody, a suicide, a homicide, something that we know

15    various agencies and individuals will want to review the

16    file.  So therefore we wanted to have it readily available

17    and also in a secure location where we know the whereabouts

18    and who has access to it.  And that filing cabinet in our

19    office served such a purpose.

20    Q.      Let's start generally.  On March 17th, who has access

21    to that file cabinet?  You?

22    A.      Yes.  Myself, Mr. Hendricks.

23    Q.      Who else?

24    A.      Vernessa Lauria.

25    Q.      Anyone else?

1    A.      No.

2    Q.      Custom and practice.  In March '08, has Ms. Vanessa

3    asked your permission to access the file?

4    A.      Her name is Vernessa.

5    Q.      Excuse me.

6    A.      And I can spell it for the court clerk.

7    V-E-R-N-E-S-S-A.

8            THE COURT:  Her last name is Lauria; right?

9            THE WITNESS:  Lauria, L-A-U-R-I-A.

10           THE COURT:  Go ahead, Mr. George.  Your question

11   again.

12   Q.      BY MR. GEORGE JR.:  Did Ms. Lauria need your

13   permission to access that file cabinet?

14   A.      As a general rule, no, because there are other things

15   in that file cabinet other than specific charts.  There are

16   employee files in there that she would need to send to the

17   Department of Psychiatry.  There are various documents.  So

18   she did not have to sign in and out or ask our specific

19   permission.  It was a mutual understanding the documents in

20   there, as our administrative assistant, she had access to.

21   Q.      And it was a poor question on my part.  I didn't

22   necessarily mean the cabinet.  I meant Mr. Singh's JPS file.

23   Same rules for Mr. Singh's file?

24   A.      Same rules.  I don't recall her ever asking me for

25   access to his file until a request from Mr. Katz's office

1    came, I believe, in April.

2    Q.      Let's turn to Court Exhibit 1.  It's page 30006.

3    A.      Can you tell me which document you're referring to?

4    Q.      Sure.  It's under the transcript that's in front of

5    you, and it's page 30006.

6    A.      Okay.  I have it right here.

7    Q.      All right.  And you've seen this page before?

8    A.      Yes, I have.

9    Q.      And you knew on or before April 2008 that Mr. Katz had

10   requested the Baljit Singh file?

11   A.      On or before what date in April?

12   Q.      How about April 14th?

13   A.      Correct.

14   Q.      Thank you.  Going back to March 17th, 2008, you had an

15   expectation that litigation would arise from Baljit's death?

16   A.      Yes.

17   Q.      And one of the reasons why you took custody of

18   Baljit's file was, as you said, readily access for that?

19   A.      For what?

20   Q.      For the file, in anticipation of litigation.

21   A.      Not necessarily anticipation of litigation.  As I

22   said, it's a sentinel event.  People are going to be

23   reviewing the chart.  Risk Management, department

24   administration.  So readily accessible to various individuals

25   who want to look at the chart.  I knew, as I testified in my

1   deposition, that we knew that there would be litigation,

2   especially when a request from the Law Office of Stewart Katz

3   comes a month after a suicide.

4   Q.      You had that expectation before April 14th?

5   A.      Yes.

6           THE COURT:  Let me ask a question.

7           You learned of the suicide either late Friday night or

8   Saturday morning.

9           THE WITNESS:  Late Friday night, your Honor.

10          THE COURT:  Did you give instructions to anyone at the

11  jail, within JPS, as to what they should do with that file

12  over the weekend?

13          THE WITNESS:  Yes.  As far as I recall, I believe that

14  when Ms. -- Ms. Champeau was the -- it was Ms. Champeau or

15  Ms. Boylan from Correctional Health.  I don't recall.  One of

16  the two was the first to notify me.  And I remember receiving

17  the phone call at home.  When I had my first conversation

18  with Ms. Champeau that evening, there was a discussion about

19  the chart.  And I believe, to the best of my recollection,

20  she had said that Mr. Hendricks had already instructed her to

21  secure the chart in our office or in a secure location.

22          THE COURT:  Okay.  Go ahead.

23  Q.      BY MR. GEORGE JR.:  Doctor, I direct your attention to

24  the next page.  It's 30007.

25  A.      Yes.

1    Q.      Whose handwriting is in the top-right corner, please?

2    A.      That's mine.

3    Q.      And you approved that on April 14th, 2008?

4    A.      I approved the release -- okay, to the best of my

5    recollection, I was notified about this incident last week.

6    I was out of town on vacation.  Since I've returned, the best

7    of my recollection, and I reviewed this this morning, is that

8    this was not a standard scenario in which Ms. Lauria would

9    respond to attorney requests for records.

10           I started as the medical director in 2003.  She had

11   been employed with the department well before my tenure

12   started.  In her role as administrative assistant under a

13   prior medical director and a prior clinical director, one of

14   her chief roles was to be the, for lack of a better word, the

15   custodian of the JPS records.  And to serve the function,

16   because we receive on a weekly basis, at least at this point

17   before we turned it all over to Correctional Health, we

18   received about 10 to 20 requests for JPS records from various

19   agencies; from various attorneys, from Social Security, from

20   disability attorneys, from criminal defense attorneys, from

21   federal attorneys, from immigration attorneys.  It was a

22   busy, busy process.  It was one of the things that took up

23   Ms. Lauria's administrative time during the week.

24           So routinely if I got a request, I didn't sign off on

25   every request.  There was just too many to do it.  Why I

1    recall this one was unusual or different is that attached to

2    it was a death certificate.  And that death certificate is

3    30009.  And it said that the decedent, Mr. Singh -- well, the

4    reason why she brought it to me, the decedent, Mr. Singh, was

5    not obviously able to sign the request for records.  So she

6    said, Dr. Sokolov, or Greg, she calls me Greg, Greg, this is

7    an unusual request.  We have a release for somebody's records

8    not signed by the actual individual, obviously because he was

9    deceased; that I understand the nature why.  She said do you

10   want to honor this request?  Because Ms. Lauria would go to

11   regular trainings at the Department of Psychiatry at the

12   UC Davis Medical Center on HIPAA.  And in those trainings,

13   those trainings were mostly geared for medical center staff,

14   although we don't work at the medical center.  They would

15   tell her you've got to make sure that everything is signed on

16   the release, the dates are right, that there's no mistakes or

17   there's no scribble marks.  If there are, according to

18   UC Davis, that's not a standard release.  You have to send it

19   back.  You have to tell the attorney to get a standard

20   release.

21        That, to the best of my recollection, is what

22   triggered Ms. Lauria to bring this release to my attention.

23   I reviewed it, and I knew this case.  I knew Mr. Singh.  So I

24   approved the release for the records.  I did not want to deny

25   this request because I did not want anyone to think that we

1    were holding back any records to give to the attorney.

2    Q.      When is the last time you spoke with Ms. Lauria?

3    A.      Two years ago when she left.

4    Q.      Do you know her present employer?

5    A.      No, I do not.

6    Q.      You said you knew Mr. Singh.  How is it that you knew

7    Mr. Singh?

8    A.      I knew of the case.

9    Q.      As I understand your testimony, Ms. Lauria asked you

10   for approval because of the presence of the presentation of

11   the death certificate.  It was an unusual request.

12   A.      That's correct.

13   Q.      Okay.  Did you give Ms. Lauria any instructions on

14   photocopying the JPS file for Baljit Singh?

15   A.      No.  I told her that I would approve the request and

16   to go forward with her usual practice, which is copying JPS

17   records.

18   Q.      And, Doctor, when you say copying JPS records, you

19   mean copying all of the JPS records.  True?

20   A.      That's the assumption, yes.

21   Q.      Doctor, you have experience reviewing JPS files.  Is

22   that a fair statement?

23   A.      Yes.

24   Q.      You've had occasion to review files of other

25   clinicians and their treatments of inmates at Sacramento

1    County Jail.  True?

2    A.      That's correct.

3    Q.      All right.  Is it a fair statement to say that you are

4    familiar with the contents of a JPS file?

5    A.      Yes.

6    Q.      Is it a fair statement to say that the CATS is a

7    routine part of the JPS file?

8    A.      It depends.  And I qualify the "it depends."  Usually

9    a CATS is referred to in the clinician notes.  So they'll say

10   I reviewed the CATS history or they'll say CATS history of.

11   And so they're making a referral to that actual CATS

12   printout.  It doesn't mean that every time, they were

13   printing the CATS out.  That was really up to a clinician's

14   decision.

15   Q.      What is up to the clinician's decision?

16   A.      Whether or not they're going to print out the CATS and

17   put it in the chart.  You asked me routinely.  Does it mean

18   it's happening on every case, I can't say that it is.

19   Q.      I don't want to consume court time talking about the

20   procedures.  There is a policy that requires a printed CATS

21   to be placed in the JPS file.  Fair statement?

22   A.      Fair statement.

23   Q.      Okay.  There is a Title 15 death review.  Is that an

24   accurate description?  A mandated Title 15 death review on a

25   completed suicide.

1    A.      That's correct.

2    Q.      Okay.  And you've testified in your deposition on

3    November 15th and December 8, 2011, that you reviewed

4    Baljit's file prior to that death review.  True?

5    A.      True.

6    Q.      All right.  And you're not the only JPS clinician to

7    have reviewed Baljit's file prior to the death review.  True?

8    A.      True.

9    Q.      Mr. Hendricks reviewed it?

10   A.      Yes.

11   Q.      Dr. Hales?

12   A.      Yes.

13   Q.      And collectively, you, Dr. Hales, Mr. Hendricks

14   discussed JPS services provided to Baljit during that death

15   review.  Fair statement?

16   A.      Not a fair statement.  Dr. Hales was not at the

17   Title 15 death review.  So if you can clarify the time and

18   which death review, that would make it easier for me to

19   answer the question.

20   Q.      I thought there was one death review on March 19,

21   2008.

22   A.      That was an administrative meeting that we had as part

23   of our regular meetings with Dr. Hales and Ms. Shahrokh from

24   the Department of Psychiatry.  The Title 15 death review

25   occurred at another time and setting.  And to the best of my

 1    recollection, Dr. Hales was not present.

 2    Q.       Okay.  Thank you for that clarification, Doctor.

 3    A.       You're welcome.

 4              THE COURT:  So I'm clear, you're saying the March 19,

 5    2008, administrative meeting wasn't a death review.

 6              THE WITNESS:  Not, your Honor, by the formality, the

 7    nomenclature of Title 15.  It was a clinical meeting that we

 8    have on a regular basis that consisted of myself,

 9    Mr. Hendricks, Dr. Hales, and Ms. Shahrokh on an

10    every-two-week basis, either at the jail or UC Davis Medical

11    Center.  Because there was a suicide of recent nature, that

12    was the topic of discussion and review, but I wouldn't

13    qualify that as any kind of formal death review in itself.

14              THE COURT:  What's the difference between what

15    happened at the administrative meeting and what you called

16    the formal death review?

17              THE WITNESS:  The formal death review, the meeting is

18    run by the medical director of Correctional Health Services.

19    At that time it was Dr. Peter Dietrich.  At that meeting are

20    various individuals from Jail Psychiatric Services,

21    Correctional Health Services, Sacramento County Sheriff's

22    Department.  So the individuals who are attending that

23    meeting are different.  And the issues that are discussed in

24    detail are different because the death review looks at all

25    available information, including Correctional Health.  When I

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    met with Dr. Hales and Ms. Shahrokh on the 19th, I didn't

2    have the Correctional Health file in front of me to also give

3    input on the level of medical care and those various issues.

4            THE COURT:  Go ahead.

5    Q.      BY MR. GEORGE JR.:  Before your November 15th, 2011,

6    deposition, you had reviewed Baljit Singh's JPS file on

7    numerous occasions.  Fair statement?

8    A.      Fair statement.

9    Q.      And you were asked specifically about the presence of

10   CATS in Baljit's file.  Do you remember?

11   A.      Could you refresh my memory where I was asked about

12   that?

13   Q.      So, Doctor, you have two volumes.  We're going to go

14   to volume 1.  I turn your attention to the bottom of page

15   168, line 25.

16           THE COURT:  Say that again.

17           MR. GEORGE:  Yes, your Honor.  It's volume 1.  It's

18   page 168, it's going to be lines 25 through 169, line 4.

19           THE COURT:  All right.  We'll start there in the

20   afternoon.  Let's take a break.

21           MR. GEORGE JR.:  2:45, your Honor?

22           THE COURT:  2:30.  Let's shoot for 2:30 this

23   afternoon.

24           MR. TYLER:  Sir?

25           THE COURT:  We'll be back at 2:30.

1              MR. TYLER:  Your Honor, if I may.

2              THE COURT:  Yes.

3              MR. TYLER:  Dr. Tompkins, can he be excused?  Because

4    he actually is a charge psychologist or whatever over at

5    SMHTC.

6              THE COURT:  Yes.

7              (Lunch recess taken at 11:51 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2               MONDAY, APRIL 8, 2013, 2:30 P.M.

3                         ---oOo---

4          THE COURT:  Dr. Sokolov.  Page 168; right?

5          MR. GEORGE JR.:  Yes, your Honor.

6          THE COURT:  What line?

7          MR. GEORGE JR.:  Line 25.

8          THE COURT:  Do you want him to read this?

9          MR. GEORGE JR.:  It's five lines.  May I read it, your

10   Honor?

11         THE COURT:  Well, do you want him to read it?

12         MR. GEORGE JR.:  I do.

13         THE COURT:  Go ahead.  You don't have to read it out

14   loud.  There's no jury here.

15         THE WITNESS:  Starting at what line, please?

16         MR. GEORGE JR.:  Starting at page 168, line 25.

17         THE WITNESS:  Yes.

18              DIRECT EXAMINATION, (Cont'd.)

19   BY MR. GEORGE JR.:

20   Q.    Doctor, you were asked directly about a CATS printout

21   in Baljit's file.  Yes?

22   A.    Yes.

23   Q.    And you indicated that there was none; correct?

24   A.    Yes.

25         THE COURT:  I'm sorry to interrupt.  You should

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

 1  probably refer to it as Mr. Singh's file rather than

 2  Baljit's.

 3          MR. GEORGE JR.:  Thank you.

 4  Q.      BY MR. GEORGE JR.:  Mr. Singh's file?

 5  A.      Yes.

 6  Q.      And we know from Dr. Tompkins' testimony this morning

 7  that his printed CATS paperwork was in Mr. Singh's file as of

 8  March 14, 2008.  True?

 9  A.      True.

10  Q.      And we know that you took custody of the JPS file on

11  March 17th, 2008.  Yes?

12  A.      Yes.

13  Q.      So nothing was added to the file after March 17th.

14  True?

15  A.      That's true.

16  Q.      And nothing was taken out?

17  A.      That's true.

18  Q.      Why did you say there was no printed CATS file in

19  Mr. Singh's JPS file?

20  A.      Because when I was asked this question at my

21  deposition in 2011, at that point I was using the copied

22  chart as my reference.  When I met with my attorney,

23  Mr. Tyler, in the day or the day preceding my deposition, we

24  went over the copied file he had in its entirety.  And when I

25  was asked this question by Mr. Katz, the paper chart that we

1  reviewed had a printout.  That's what I was referring to; the

2  paper chart that I reviewed with Mr. Tyler for my

3  pre-deposition conference.  I believe that was the same paper

4  chart that Mr. Katz produced at the deposition and would

5  periodically give me to review sections of.

6  Q.     Are you saying that you knew a printed CATS was in the

7  JPS Baljit Singh file?

8  A.     At that time I did not recall seeing it in this green

9  file.

10  Q.     Did you see it in any other location?

11  A.     I did not see it until it was refreshed by my memory

12  this morning that it was discovered in the file last week.

13          THE COURT:  Had you seen it in 2008?  Had you seen the

14  CATS printout in 2008 and then you just forgot about it?

15          THE WITNESS:  That's possible, your Honor, because I

16  was focusing on the clinical assessments done by

17  Ms. Champeau, Ms. Severance, and Dr. Tompkins.  And I was

18  not -- those were the ones that were in my memory, and those

19  were the ones that I reviewed in detail with Mr. Tyler in

20  preparation for my deposition.  At the time of my deposition,

21  I had probably seen it in our green file but had forgotten

22  about it because, in my mind, it was not a clinically

23  significant document in my assessment of this suicide.

24          THE COURT:  Go ahead.

25  Q.     BY MR. GEORGE JR.:  Doctor, let's turn to Court's

1    Exhibit 1, page 30020.

2           THE COURT:  Hang on a second.  Why isn't, in your

3    mind, a CATS printout a clinically significant document?

4           THE WITNESS:  I say that, your Honor, with clinical

5    experience.  At the time of Mr. Singh's suicide, I had been

6    the medical director at the jail for five years.  In addition

7    to being an administrator, I'm also a clinician.  I see

8    approximately 80 to 100 inmates a week for psychiatric care.

9           The CATS, your Honor, is literally a spreadsheet, for

10   lack of a better word.  It has diagnostic code entries.  It

11   has dates of service.  And earlier this morning when you

12   asked Dr. Tompkins what the various abbreviations stood for,

13   I believe you asked him for C.C.  That means cost center.

14   And so that could be any of the 20, 30 plus mental health

15   community clinics in the county.

16          What in my psychiatric and clinical experience is more

17   significant is what the clinician does with this numerical

18   tabulation data.  When I reviewed this suicide of Mr. Singh

19   in the days following it, when I reviewed Ms. Severance's

20   note, she had made reference in her note to prior mental

21   health history in the community.  Included in that reference,

22   she had made a diagnosis of a major depressive disorder.  She

23   had documented that he had received treatment in the past

24   from the Visions clinic.  She had even documented the name of

25   the psychiatrist he had seen in the past in the community.

1      And then in her, what's called client data sheet, which was

2      included in the original file that was submitted to both

3      counsel, she makes two diagnoses on Axis 1.  She makes a

4      diagnosis of major depressive disorder and a second diagnosis

5      of alcohol dependence.  Both of these diagnoses are in the

6      CATS printout.  So she imported that numerical tabulation

7      data into a clinical form.  And she had used a diagnosis that

8      was in Mr. Singh's prior clinical records.  Actually, two

9      diagnoses.  Major depression and alcohol dependence.  So she

10     effectively imported the CATS data into a clinical form.  And

11     the clinical form is where there is a significance in doing a

12     suicide assessment.

13             THE COURT:  But doesn't the CATS form give you a

14     history?

15             THE WITNESS:  It does.

16             THE COURT:  Wouldn't that be significant to you?

17             THE WITNESS:  It is if it is, again, imported into the

18     clinical data sheet.  And that's what she did.  She put into

19     her clinical assessment form documenting that he had a prior

20     mental health history.  I can say where --

21             THE COURT:  Well, hang on.  Saying someone has a prior

22     mental health history and looking at a CATS printout that

23     shows exactly when that history was, you'd agree that's two

24     different things.  There's more detail in this printout, the

25     CATS printout; right?

1            THE WITNESS:  Well, the diagnoses that are printed on

2       this form are the same diagnoses that she used.  So it's

3       essentially the same information.

4            THE COURT:  Okay.  I'm not going to argue with you.

5            Go ahead, Mr. Katz.

6            MR. KATZ:  Mr. George.

7            THE COURT:  I'm sorry.  Mr. George.

8       Q.    BY MR. GEORGE JR.:  We're on page 30020, Doctor.

9       A.    Yes.

10      Q.    I direct your attention also to page 30021.  You'll

11      recognize that one has handwriting on it and the other does

12      not.

13      A.    Yes.

14      Q.    Dr. Tompkins testified this morning on this issue.

15      A.    Yes.

16      Q.    Do you have any explanation as to why 30020 is a

17      clean, non-handwritten page, and the printed material on

18      30021 exists in the JPS file?

19      A.    30020 may have been printed by somebody else who

20      decided not to write on it, can be the only explanation I can

21      offer.

22      Q.    Printed by who, Doctor?

23      A.    I don't know.

24      Q.    Printed when, Doctor?

25      A.    I don't know.

1    Q.      Put in the file when, Doctor?

2    A.      I don't know.

3    Q.      Reviewed by who?

4    A.      I don't know.

5    Q.      Last reference to your deposition, Dr. Sokolov.  Page

6    51, please.

7            THE COURT:  Same volume?

8            MR. GEORGE JR.:  Yes, your Honor.

9    Q.      BY MR. GEORGE JR.:  Line 22, please, continuing

10   through the next page, line 4.

11   A.      Yes.

12   Q.      So this morning you testified about an administrative

13   review.

14   A.      Yes.

15   Q.      And then the Correctional Health Services review.

16   Yes, sir?

17   A.      Yes.

18   Q.      All right.  Your deposition testimony only makes

19   reference to one review.  Yes?

20   A.      Yes.

21   Q.      Why?

22   A.      Because I considered the death review of Mr. Singh by

23   Correctional Health a death review, and the administrative

24   meeting I have on a biweekly basis with my administrators is

25   a clinical meeting at which time the suicide of Mr. Singh was

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    discussed.  But as I testified to earlier this morning, it's

2    not what I considered a formal death review as per Title 15.

3    Q.      Dr. Sokolov, you were present at the defendants'

4    deposition of plaintiffs' retained expert Dr. Emily Keram.

5    Yes, sir?

6    A.      Yes, I was.

7    Q.      You heard Mr. Tyler's questions about the contents of

8    the JPS file.  Yes?

9    A.      Mr. Tyler was not questioning Dr. Keram.  I believe it

10   was your father.

11   Q.      Mr. Tyler asked Dr. Keram questions.  If you don't

12   remember, you don't remember.

13   A.      Oh, Mr. Tyler.  I'm sorry.  Yeah, Mr. Tyler, our

14   attorney, did, yes.

15   Q.      Yes, sir.  And some of those questions were about the

16   contents of the JPS file?

17   A.      Depends.  I left early.  I had a commitment to get to.

18   So I don't know what time he asked her those questions.

19   Q.      You are aware that the contents of the JPS file is an

20   issue in the case?

21   A.      Yes.

22   Q.      Okay.  And Dr. Keram was deposed way back in June of

23   last year, 2012.  Does that sound about right?

24   A.      Yes.

25   Q.      You were also present for Dr. Hayward, another

1    plaintiffs' retained expert's deposition.  Yes, sir?

2    A.      Yes, I was.

3    Q.      And at Dr. Hayward's deposition, Exhibit 102 was the

4    52-page version of the JPS file.  Yes?

5    A.      I believe so, yes.

6    Q.      On any occasion did you look at the 52-page chart, the

7    JPS file, and have a moment of clarity and know it wasn't the

8    entire JPS file?

9    A.      No.

10   Q.      A few questions, Doctor, going to Ms. Lauria.  She's

11   presently an employee at UC Davis.  Yes, sir?

12   A.      I don't know.

13   Q.      Did you ever direct her to copy something other than

14   the complete Baljit Singh JPS file?

15   A.      No.

16   Q.      Was Ms. Lauria ever terminated for making errors in

17   copying something other than the entire JPS file?

18   A.      No.  Ms. Lauria left on her own terms from JPS.  She

19   was not terminated.

20   Q.      Dr. Sokolov, let's go back to 30020, please.

21            THE COURT:  I'm sorry.  Do you have any explanation

22   why Ms. Lauria would only copy half the file?

23            THE WITNESS:  Your Honor, I've given this much thought

24   during the break, and I can only speculate.

25            THE COURT:  Well, don't speculate.

1        THE WITNESS:  Well, at the time that this chart was

2   compiled, we had two sections of the chart.  Do you have the

3   green chart?

4        THE COURT:  Yes.

5        THE WITNESS:  Okay.  And typically all progress notes

6   written by a JPS staff with a one-to-one patient contact, any

7   kind of telephone referral, anything that was a JPS staff

8   doing some type of patient-related function, it would be

9   filed on the right-hand side of the chart.  And then the

10  left-hand side of the chart, as we've heard this morning,

11  contains a lot of extraneous information, binders, things

12  like that, and the CATS printout.  And as I've already

13  testified earlier, the CATS is a printout that is

14  interpolated into the clinical section of the chart, which is

15  the right-hand side of the chart.

16       I also reviewed Mr. Katz's release of information.  In

17  the heading of Mr. Katz's release of information, he asks for

18  psychotherapy notes.  And to the best of my knowledge, as I

19  said, Ms. Lauria was going to HIPAA training at the

20  Department of Psychiatry at the UC Davis Medical Center.

21  That was a specific request, psychotherapy notes.  Whether a

22  CATS printout sheet is considered a psychotherapy note I

23  think is a matter of judgment.

24       THE COURT:  Mr. Katz or Mr. George, when you got

25  documents in response to your subpoena -- you've now had a

1    chance to look at the green file -- did you only get

2    documents from one side of the file?

3            MR. KATZ:  Negative, your Honor.

4            THE COURT:  Okay.  And the second question is, I think

5    we've established this in the phone call, you actually did

6    get a CATS printout in response to the subpoena.

7            MR. KATZ:  You know, actually, your Honor --

8            THE COURT:  Is that correct?

9            MR. KATZ:  No, that's incorrect.  I did, however,

10   misspeak that when we spoke on the phone on Friday.

11           THE COURT:  So you didn't get any CATS printouts?

12           MR. KATZ:  Correct.

13           THE COURT:  The first time you saw a CATS printout

14   was --

15           MR. KATZ:  At the deposition -- when I saw the

16   transcript actually of the deposition of Mr. Tompkins, your

17   Honor.

18           THE COURT:  When he brought it in his file.

19           MR. KATZ:  Yes.

20           THE COURT:  Okay.  All right.  Next question.

21   Q.      BY MR. GEORGE JR.:  Back to 30020, Dr. Sokolov.

22   A.      Yes.

23   Q.      It appears there are two sets of two-hole punches at

24   the top of the page.  Do you see that?

25   A.      Yes.

1    Q.      Why?

2    A.      I have no idea.

3    Q.      Do you have any explanation as to where

4    Ms. Lori Severance's progress note that refers to her

5    communication with you is?

6    A.      I don't know.

7    Q.      Do you know if Ms. Severance printed a CATS material?

8    A.      I assume she did.

9    Q.      Is that in the JPS file that's Court's Number 1?

10   A.      The CATS printout that Lori Severance did?

11   Q.      Yes, Doctor.  Is that in Court Number 1?

12   A.      I don't know.

13           THE COURT:  Did she testify that she did in her

14   deposition?

15           MR. TYLER:  She testified it was her custom and

16   practice.  No independent recollection.

17           THE COURT:  That she would print out a CATS document?

18           MR. TYLER:  Right.

19           MR. KATZ:  And, your Honor, Dr. Tompkins testified

20   that he saw the printout in the file as well as confirming

21   today that he never printed out a CATS printout.

22           THE COURT:  Okay.

23           MR. TYLER:  I don't know that he said that latter

24   part.

25   Q.      BY MR. GEORGE JR.:  Dr. Sokolov, I direct your

1    attention to Court Exhibit 2.  It's the blue pages in front

2    of you, please.

3    A.       Yes.

4    Q.       Page 4, bottom right-hand corner says, in part, "CATS

5    4."

6    A.       Yes.

7    Q.       This is a document that's not in the JPS file that was

8    produced and marked today, Court's 1.  Does that make sense

9    to you, Doctor?

10          MR. TYLER:  Well, that calls for speculation.  This

11    was produced by Dr. Tompkins at his deposition.

12          THE COURT:  Right.  And we already know that he

13    printed it out and then kept it.  So I don't understand what

14    you're trying to get from the question.  I already know how

15    this was created and how you got it.  Mr. Tompkins printed it

16    out and stuck it in his file and took it with him after he

17    left.

18          MR. GEORGE JR.:  It's because it's part of the CATS

19    printout.  We went through the "pause" and then the -- and it

20    occurs or appears at the end of the Client Movement History.

21          THE COURT:  I'm not following your point.  Are you

22    looking at page 4 in the blue copy?

23          THE WITNESS:  I am, your Honor.  And I'm comparing it

24    to what is in the JPS file.  And I can give what I believe is

25    a reasonable explanation as to why it wasn't included.

1            THE COURT:  Well, answer that question.

2            THE WITNESS:  As we testified -- not we.  As

3    Dr. Tompkins testified to earlier this morning when asked

4    about the details of the CATS printout sheet, there are

5    various sections to it.  The diagnosis is on the first page.

6    And if you notice the dates of the diagnoses on the diagnosis

7    history with the corresponding cost center code, those are

8    the same essentially time periods as the treatment history.

9    The difference in these two is on the treatment history, you

10   have a therapist code, a duration code of service.  And so --

11           THE COURT:  Is that days?

12           THE WITNESS:  It's probably, your Honor, more likely

13   minutes, because there's 15, 60, 20.  And so what you have is

14   the same treatment interval.  One with a diagnosis and one

15   who had the individual therapist code and how much time they

16   spent with the patient.  And so the reason why it wasn't, in

17   this case and in probably other cases, all put into the chart

18   is because the purpose that the CATS served for us is to see

19   the prior history in terms of the diagnoses and movement

20   history.

21           This treatment history is like the third part of that

22   document and probably the least clinically significant of the

23   three because it already has the same time interval as the

24   diagnosis and movement history.

25           THE COURT:  What does A.S. stand for, if you know?

1          THE WITNESS:  I don't know.

2          THE COURT:  And do you see that number sign U, do you

3     know what that means?

4          MR. TYLER:  We're talking about page 4, your Honor?

5          THE COURT:  We're still on page 4.

6          THE WITNESS:  I don't know, your Honor.

7          THE COURT:  Okay.  Go ahead.

8     Q.    BY MR. GEORGE JR.:  Dr. Sokolov, is it your testimony

9     that the JPS clinician has some discretion as to what printed

10    CATS material makes it into the official JPS file?

11    A.    Yes.  Because like I said, the purpose of the CATS is

12    a diagnostic and movement history.  The treatment history is

13    already encapsulated in both of those prior documents.

14         THE COURT:  Did Dr. Hendricks have authorization to

15    take this CATS printout, this Court Exhibit 2?

16         MR. TYLER:  Tompkins.

17         THE COURT:  I'm sorry.  Dr. Tompkins.  I misspoke.

18         THE WITNESS:  Did he have authorization when, your

19    Honor?

20         THE COURT:  He said he printed it out and he kept it.

21         THE WITNESS:  No.

22         THE COURT:  He shouldn't have kept it; right?

23         THE WITNESS:  That's correct.

24         THE COURT:  He should have put it in the file.

25         THE WITNESS:  That's correct.

1              THE COURT:  Okay.  Is this the first you've heard of

2     it, that he kept it?

3              THE WITNESS:  Yes.

4              THE COURT:  During your death review, did you

5     interview him?

6              THE WITNESS:  During what death review?

7              THE COURT:  Or any review of the suicide.  Did you

8     talk to him?

9              THE WITNESS:  I talked with Dr. Tompkins the Monday

10    following the suicide, yes.

11             THE COURT:  Did he tell you:  I have a CATS printout?

12             THE WITNESS:  No, he did not.

13             THE COURT:  That I made notes on, and I'm going to

14    keep it, or anything to that effect?

15             THE WITNESS:  No, your Honor.

16             THE COURT:  What if he had told you that?  Would you

17    have told him it is policy to put it in the file?

18             THE WITNESS:  I would have told him to put it in the

19    file, yes.

20             THE COURT:  Anything he printed out and may have

21    relied on, he should have put in the file?

22             THE WITNESS:  Well, yes.  I mean if he had his own

23    notes that he later transcribed into a chart note, he could

24    keep those chart notes in his office space.  But anything

25    that he's going to sign or print, he should put in the chart.

1          THE COURT:  Do you think that would have been

2     significant to you if you had known that around March 16th of

3     2008, he had printed out a CATS history and made notes on it?

4          THE WITNESS:  Significant in terms of what, your

5     Honor?

6          THE COURT:  In terms of your death review?

7          THE WITNESS:  No.

8          THE COURT:  And his actions in it?

9          THE WITNESS:  No.  Actually, I take that back.

10         THE COURT:  Wouldn't you have wanted these notes when

11    you were talking to him about what he did?

12         THE WITNESS:  The CATS printout that he wrote on?

13         THE COURT:  Court Exhibit 2.

14         THE WITNESS:  No.  Because I reviewed his progress

15    note and discussed with him the purpose of him evaluating

16    Mr. Singh, and I felt that that was sufficient information

17    for me to make an assessment of his care or his evaluation.

18         THE COURT:  Go ahead.  Anything further, Mr. George?

19         MR. GEORGE JR.:  Nothing further, your Honor.  Thank

20    you.

21         THE COURT:  Questions?

22         MR. TYLER:  A couple.

23         THE COURT:  Mr. Tyler, go ahead.

24

25

```
 1                        CROSS-EXAMINATION

 2   BY MR. TYLER:

 3   Q.      The two-hole punched documents, do you have the

 4   original chart there in front of you?

 5   A.      No.

 6           THE COURT:  I have it.

 7           THE WITNESS:  No, I do not.

 8           THE COURT:  Do you want it?

 9           MR. TYLER:  No.  I'm going to ask a question.

10   Q.      BY MR. TYLER:  Hypothetically, let's just assume that

11   if we were to go through this and find that the documents

12   that are double punched or double two-hole punched are, in

13   fact, 30017, which has all the handwriting on it from

14   Mr. Tompkins, and then if you go back --

15           THE COURT:  Well, Mr. Katz has a whole list of which

16   ones are double punched.

17           MR. TYLER:  I went back, and there were some that were

18   not.  And what looked to me like the ones that were double

19   punched were everything that had Mr. Tompkins' handwriting on

20   it.

21           THE COURT:  So what's the question?

22           MR. TYLER:  I wanted him to be able to look at the

23   chart and identify which particular documents are double

24   punched and which aren't.

25           THE COURT:  Well, I can do that.
```

 1          MR. TYLER:  Okay.  I would just have the Court take

 2     notice that the ones that are double punched are 30 -- well,

 3     you've got the original chart.  It doesn't have marks on it.

 4     Is the Request for Provider Services --

 5          THE COURT:  Well, save it for argument.  Is there a

 6     question that you have?

 7     Q.     BY MR. TYLER:  Okay.  You talked about the request for

 8     information that underlies Mr. Katz's subpoena.  And if you

 9     can, I would have you look at that.  It actually appears on

10     what's called JP 30007.  And if I look at that, what they

11     want is the following information, and it says "all

12     psychotherapy notes pertaining to me."  Is that correct?

13     A.     Yes.

14     Q.     And psychotherapy notes is actually defined up at the

15     top of this authorization; is it not?

16     A.     Yes.

17     Q.     And what is it that you found of salience in there in

18     giving your prior answer?

19     A.     The judge had asked me did I have an explanation why

20     Vernessa had only copied half the chart.  And I said upon

21     further review and reflection after this morning's testimony

22     and afternoon break and looking at the original request for

23     records supplied by Mr. Katz's office, the language in his

24     own release of records is very specific as to what they

25     wanted and what they defined as psychotherapy notes.

1          THE COURT:  Mr. Tyler, I'm going to cut the witness

2     off because you and I both know he's speculating, and the

3     only person that knows why certain things were copied is the

4     person that copied them.  So this testimony isn't very

5     helpful.  And I already heard his explanation, but it's just

6     a guess.  He doesn't know.  He didn't give her directions.

7     He didn't give her any directions on what to copy.  That's

8     the testimony.  Right?

9          MR. TYLER:  He told her to copy --

10          THE WITNESS:  JPS records.

11          THE COURT:  He didn't tell her anything.  He just

12     authorized it.  I didn't hear any testimony about a

13     conversation he had with her.

14          MR. TYLER:  He approved the release of records.  He

15     told her to go forward, to copy the records.

16          THE COURT:  There's no testimony that he told her

17     anything.  There's testimony that he authorized the release

18     of records after she said this seems unusual.  He didn't give

19     her any direction on what to copy.

20          By the way, just as an aside, there's a blank CATS

21     printout without the handwriting that is two-hole punched.

22     So it's not every document that has the handwriting on it.

23          MR. TYLER:  Well, that's the back side.  This is the

24     flimsy; right?

25          THE COURT:  There's another CATS printout with no

 1   handwriting on it that is two-hole punched too.

 2        Anyway, go ahead.  What's your question for this

 3   witness?

 4   Q.    BY MR. TYLER:  My question is you indicated that you

 5   talked -- that she would go to training over at the Med

 6   Center from Health Information Management, I believe.

 7        THE COURT:  Right.  HIPAA training.

 8   Q.    BY MR. TYLER:  And your experience was what?  What

 9   sort of questions was she coming to you with after receiving

10   those sorts of training?

11   A.    Well, I don't know how directly related they are to

12   the trainings.  I just think it was a function of the role

13   that she served and I think the diligence that she served

14   with interpreting releases of information and making sure

15   that they were compliant with the language of the HIPAA

16   standard.

17        Sometimes she would come in my office and show me a

18   release that an attorney sent us, and it looked like

19   something that a college student put together.  You know, it

20   had a "please give me all the jail records" and the person's

21   signature and the attorney's signature, not even on a

22   letterhead.  And, of course, we would deny those.  Other

23   times, we would have inmates who were representing themselves

24   pro per make up their own release forms without a subsequent

25   court order to verify they were pro per.  So many times the

1    nature of her wanting me to approve something or double-check

2    it was that if the release itself was HIPAA compliant.  And

3    sometimes if there were mistakes, like somebody put, you

4    know, misspelled the name or the date or they crossed it out

5    or it had a lot of scribbles, she would tell me, you know,

6    Dr. Sokolov, or Greg, I really don't feel comfortable with

7    this release because I went to HIPAA training, and they said

8    this and this and that.  And I would tell her okay, Vernessa,

9    call the attorney or the agency or the family member and tell

10   them we need a new form resent.

11        So this was a common occurrence.  Like I said, if she

12   was doing 10 to 20 record copying requests a week, she was

13   probably coming in my office once or twice a week with some

14   question.  Usually it was a very quick question; does this

15   look okay to you?  This one, as I testified earlier this

16   morning, triggered a discussion because we were provided with

17   a death certificate, and we did not have the -- obviously, we

18   did not have the decedent signing this release.  We had his

19   wife signing the release.  And Vernessa, I think, diligently

20   wanted to make sure that the paperwork looked okay from my

21   standpoint.

22   Q.    The CATS policy.  You were asked about the CATS

23   policy, the JPS policy to have the clinicians print the CATS

24   and put it in the file.  What was the purpose of that policy?

25   A.    Well, first of all, the policy was developed prior to

1    me becoming medical director by previous JPS administration.

2    And the purpose of that policy was really to force clinicians

3    to look at the CATS, especially when they were doing the

4    initial intake evaluation.  When they were the first person

5    doing that initial evaluation, they were gathering as much

6    collateral information as they could, which was the CATS,

7    going into their assessment.

8         The other purpose that the CATS served is prior to

9    getting the electronic medical record as we have now, we

10   would have many inmates, as Mr. Singh, frequently come in and

11   out of jail.  Sometimes it would be within a matter of a

12   month.  And by the time they were rearrested, we still had

13   their old chart in the JPS outpatient office.  And sometimes

14   it would be in the matter, like Mr. Singh, a year or longer.

15   If they were out of custody a year or longer, the charts

16   would get sent out to an outside medical storage facility

17   called Iron Mountain that the sheriff's department had a

18   contract with.

19        Now, unless the clinician remembered an inmate that

20   had been rearrested or unless it joggled somebody's memory,

21   oh, yeah, he was in last week, I mean he was in last year, I

22   remember that guy, they would go to the CATS.  And at that

23   time, one of the entries for CATS, one of the cost centers

24   that's listed here in movement history is Jail Psychiatric

25   Services.  And they knew that code very well.  And if they

1    saw that code, that would force them to know that there were

2    prior JPS records available and to call Iron Mountain and

3    request them.

4         Now that we're on the electronic system, we no longer

5    have to do that because they can just look on the computer

6    archive files.

7         THE COURT:  So you wanted the clinician to look at the

8    CATS printout, or at least look at the CATS on the computer

9    screen.

10        THE WITNESS:  Yes.

11        THE COURT:  One of the first things you tell them to

12   do is look at it.

13        THE WITNESS:  Well, that's not the first thing that

14   they're going to --

15        THE COURT:  It's one of the first things that you want

16   them to do.

17        THE WITNESS:  One of the initial things, yes.

18        THE COURT:  And yet you're telling me it's not a

19   significant document or doesn't contain significant

20   information.  Doesn't that seem sort of inconsistent?

21        THE WITNESS:  I can understand, your Honor, your

22   confusion with that, and I can explain.

23        THE COURT:  It's not a confusion.  It's skepticism.

24   Your answer is that it's not a significant document to you.

25   I'm really skeptical of that answer, given all I'm hearing

 1   about how important this printout is.

 2        THE WITNESS:  I understand, your Honor.

 3        THE COURT:  Okay.

 4        THE WITNESS:  It's the information that's in the CATS

 5   printout that is then put into the clinical chart.

 6        THE COURT:  Well, now we're back to not everything

 7   that's on the CATS printout is put into a clinical chart.  We

 8   can look at Ms. Severance's notes, for example, and I'm sure

 9   Mr. Katz can do that and probably find seven or eight pieces

10   of information that aren't in her notes that you could find

11   in a CATS printout.

12        THE WITNESS:  Granted.

13        THE COURT:  Would you agree with that?

14        THE WITNESS:  I would agree with that.

15        THE COURT:  In my mind, that would make the CATS

16   printout much more significant since it contains more

17   information, not less information.  Summaries don't contain

18   all the information that a CATS printout contains.

19        Is that a fair statement?

20        THE WITNESS:  I'm sorry.  What doesn't?

21        THE COURT:  A summary.  You know, a progress note, a

22   chart or a -- I can't remember what you called the document.

23        THE WITNESS:  The clinician assessment form.

24        THE COURT:  Yeah.  Those forms don't contain

25   everything that's in a CATS printout.

 1              THE WITNESS:  No.  They contain more.

 2              THE COURT:  They're summaries.

 3              THE WITNESS:  They contain more information.

 4              THE COURT:  Okay.  I'll let you ask questions.

 5              MR. KATZ:  If I could ask some follow-up questions,

 6      your Honor.

 7              THE COURT:  Mr. Tyler is not done.

 8              MR. TYLER:  I don't want to speak out of turn here.

 9              THE COURT:  No.  Go ahead, Mr. Tyler.  I interrupted

10      you.

11              Look at -- I'm sorry.  I can't get off this.  But it's

12      the last page of the green folder, which would be 30105.

13              THE WITNESS:  Yes.

14              THE COURT:  That's an assessment form; right?

15              THE WITNESS:  30105?

16              THE COURT:  The very last page.

17              THE WITNESS:  Yeah.  It's a client data sheet, yes.

18              THE COURT:  Filled out by Ms. Severance probably?

19              MR. TYLER:  No.  This is from 2003, it looks like.

20              THE COURT:  Okay.  But still, that's the form that

21      your clinicians fill out; correct?

22              THE WITNESS:  That's one of the forms they fill out,

23      your Honor.

24              THE COURT:  And you're telling me this form contains

25      more information than what's on a CATS printout?

1              THE WITNESS:  No.  I was referring to the initial

2     clinician assessment containing more information, part of

3     which could be imported from the CATS information.

4              MR. TYLER:  That's at page 78, 79, is what he's

5     referring to.  That's Severance's initial screening/triage

6     assessment.

7              THE COURT:  Right.

8              MR. TYLER:  That's what he's --

9              THE COURT:  30078?

10             MR. TYLER:  Yes.

11             MR. KATZ:  Yes, your Honor.

12             MR. TYLER:  And 79.

13             THE COURT:  And you're saying this contains more

14    information than a CATS printout?

15             THE WITNESS:  Extensively more, your Honor.

16             THE COURT:  Where is the history of his -- where is

17    his diagnosis history in here?

18             THE WITNESS:  The diagnosis, it shows as --

19             THE COURT:  No.  Where is his diagnosis history in

20    this document?

21             THE WITNESS:  Well, under mental health history --

22             THE COURT:  What page are you on?

23             THE WITNESS:  I'm on page 1 of the form or 78 Bates

24    stamp.

25             THE COURT:  Bates stamp 78.

1          THE WITNESS:  Yes.  Section Roman numeral V, mental

2     health history.  "During the past 12 months, has patient been

3     hospitalized for psychiatric treatment?  Yes.  Current

4     psychiatric care:  Yes."  Where she lists the psychiatrist,

5     the name of the clinic, and the pharmacy he's receiving meds.

6     You get no pharmacy information in the CATS.  You get no name

7     of the psychiatrist in the CATS.

8          THE COURT:  I also don't get in this form -- just look

9     at page 1 of the blue printout and his diagnosis history.  I

10    know he's diagnosed in 2003, 2004, 2004 again, 2005.  It

11    continues on the second page.  Where is all that in this

12    form?

13         THE WITNESS:  Well, the diagnosis, the predominant

14    diagnosis --

15         THE COURT:  Why don't you answer my question.  It's a

16    rhetorical question in a way.  The answer is it's not in

17    there; correct?

18         THE WITNESS:  No.

19         THE COURT:  Okay.  You would rely on 30078 rather than

20    a CATS printout.  That's what you're telling me?

21         THE WITNESS:  In reviewing if an adequate clinical

22    assessment of a suicide was done, yes.

23         THE COURT:  Okay.

24    Q.   BY MR. TYLER:  You saw all of the handwriting on all

25    of these diagnosis codes that come from 2003, 4, 6?

```
 1    A.      Yes.

 2    Q.      They talk about alcohol dependence?

 3    A.      Yes.

 4    Q.      And if I take you to the second page on this, which is

 5    30079, and I would basically take you to subpart Roman

 6    numeral IX, alcohol/substance abuse, and then it says what?

 7            THE COURT:  It says "alcohol."  What's the point?  I

 8    can read documents.

 9            MR. TYLER:  Okay.

10            THE COURT:  Is there a question?

11    Q.      BY MR. TYLER:  Well, you were just asked whether that

12    information that is in this CATS printout contains all of the

13    information.  You talked about the mood disorder or whatever.

14    The other information talks about alcohol dependence.

15            Is that noted on that particular section?

16    A.      Alcohol dependence is noted as a diagnostic entry in

17    the CATS data sheet.  In the initial clinician assessment, it

18    goes beyond just alcohol.  It goes about other drugs.  It

19    goes about history of withdrawal symptoms, both past and

20    current.  And so that is multiple steps above the information

21    that's in a one-line entry, even if it's a repeated one-line

22    entry, in a CATS data sheet.

23    Q.      And if you go to the top of that same page, staying on

24    this, and it says Roman numeral V, the very top, it says,

25    "Continued-History of Inpatient Psychiatric
```

1    Hospitalizations."  And it says "SMHTC in '05, '06, and '08."

2    A.     Yes.

3    Q.     That would be derived from the CATS?

4    A.     It would either be derived from the CATS or it would

5    be derived from what the inmate reported.

6           Now, in my clinical experience in the jail, when you

7    ask inmates have you been psychiatrically hospitalized,

8    sometimes they'll say no, and the CATS data shows they were

9    hospitalized.  Sometimes they'll say yeah, but I don't

10   remember when and where, and then the CATS data will show

11   where they were hospitalized and when.  And the three entries

12   that we have here for SMHTC would correspond with the CATS

13   data entry for the SMHTC cost center.  SMHTC is spelled

14   S-M-H-T-C.

15   Q.     I want to take you over to the Request for Provider

16   Services which is 30017.  It says --

17          THE COURT:  By the way, it's 30017 to 30026 that are

18   two hole.  There's four holes so it was punched twice.

19   Again, for the record, it's 30017 all the way through 30026.

20   Those are documents that have been punched twice.

21   Q.     BY MR. TYLER:  That particular document, what is that?

22   A.     30017 is a Correctional Health Services Case

23   Management Program Request for Provider Services dated

24   March 10th, 2008.

25   Q.     And how is it that that form comes into existence, if

1   you know?

2   A.      This is a form, one of multiple forms that

3   Correctional Health Services, which is the provider of

4   medical care in the jail system, will send to us as a request

5   for us to go see an inmate with a psychiatric issue or

6   problem.  This is one way.  The other way is through intake.

7   When somebody is seen by the intake nurse, they fill out a

8   JPS referral on the back side.  There's a level of acuity

9   that they can fill out.  If it's a "must see" referral,

10  they'll send it to us, they'll call us on the phone or fax it

11  upstairs, and that inmate is seen within that hour, if not

12  sooner.

13          THE COURT:  Why would you have both a white and a

14  yellow form?

15          THE WITNESS:  You know, your Honor, this was a

16  Correctional Health Services' documentation.  I can't explain

17  why they had multiple forms.

18          THE COURT:  No, in the JPS file.  30017 is the white

19  form and 30027 is the same form, but it's the yellow form.

20  So I know obviously it's a multiple-copy form.

21          THE WITNESS:  Usually they will, because it's a

22  duplicate form, usually they'll keep the white form in their

23  chart and give us the yellow form.  I don't know why they

24  decided not to keep a page of this form in their own chart.

25          THE COURT:  I'm starting to wonder if Correctional

1    Health Services may have added documents to the JPS file.  Is

2    that possible, that someone from Correctional Health put

3    documents into this file at some point?

4            THE WITNESS:  Is it possible that somebody from

5    Correctional Health Services got ahold of Mr. Singh's chart

6    in my office and put forms in there?

7            THE COURT:  Yeah.

8            THE WITNESS:  Unlikely.

9            THE COURT:  It's not a question that was asked, I

10   assume, through discovery.  Was anybody from Correctional

11   Health Services deposed?

12           MR. KATZ:  They were not regarding --

13           THE COURT:  Not regarding documents; right?

14           MR. KATZ:  Correct.

15           THE COURT:  Go ahead, Mr. Tyler.

16   Q.    BY MR. TYLER:  This request here, it says JPS

17   directed, and it says what services are being requested?

18           THE COURT:  Again, I can read documents.

19           MR. TYLER:  It's just a prefatory question.

20           THE COURT:  I don't need prefatory questions.  Just

21   ask him the question you want him to answer.

22   Q.    BY MR. TYLER:  Thank you.

23           THE WITNESS:  This is the --

24           THE COURT:  Hang on.  Go ahead.

25   Q.    BY MR. TYLER:  How urgent is this referral or request?

1    How urgently must this be acted upon?

2              MR. KATZ:  It's leading, your Honor.

3              THE COURT:  It is leading, but I'm giving leeway.

4    There's no jury here, folks.

5              MR. KATZ:  That's true.

6              THE WITNESS:  I'm going to answer your question in two

7    parts.  Number one, this is not an urgent referral.  I've

8    already testified that there's what's called a JPS "must see"

9    check box on the intake form.

10             THE COURT:  Where?

11             THE WITNESS:  Not on this form, your Honor, but on the

12   form that Correctional Health uses on their nurse screenings

13   of all inmates brought into custody.

14             THE COURT:  So how do we know this isn't a "must see"?

15             THE WITNESS:  Because this form, in my experience as

16   medical director, five years prior to this form, was not the

17   way that they would send us a "must see" referral.  "Must

18   see" referrals were sent via booking, via a custody referral,

19   or some other communication, either from an attorney, from a

20   family member, from an outside provider that would call us.

21   Nowadays, we have the inmate hotline, but we didn't have that

22   back then.  But this, in my clinical experience, would not be

23   a "must see" referral.

24             THE COURT:  Well, were you aware of this form when

25   Ms. Severance called you?  She had a conversation with you

1    about Mr. Singh.

2          THE WITNESS:  She did.

3          THE COURT:  Okay.  And you decided to treat him as a

4    normal patient as opposed to, you know, expedite his --

5          THE WITNESS:  Your Honor, I never had any such

6    conversation with Ms. Severance.  Ms. Severance called me to

7    inform me that Mr. Singh was on his way to UC Davis Medical

8    Center following an attempt of strangulation with some type

9    of loose adhesive covering or bandage and that she tried to

10   verify his medications earlier in the day, and she said that,

11   you know, I just want you to be informed that I tried to

12   verify his medications and nothing checked out.  That's the

13   conversation I had with Ms. Severance.

14         THE COURT:  So her recollection of that conversation

15   is different from yours.  You're aware of that; right?

16         THE WITNESS:  I'm aware of that.

17         THE COURT:  Okay.  Go ahead, Mr. Tyler.

18   Q.    BY MR. TYLER:  How many inmates self-report a history

19   of psychotropic drugs or psychiatric drugs?

20         MR. KATZ:  Your Honor, this is very far astray.

21         THE COURT:  It is far.

22         MR. TYLER:  Well, it has to do with the urgency of

23   this particular document, and I'm laying further foundation

24   as to why he considered this -- his perception of this

25   document one way or the other as how urgent it was.

1              THE COURT:  He already said he didn't view it as

2    urgent.  And he told me why, although there's nothing on this

3    document to indicate whether it is urgent or not, and then he

4    made reference to another document, which doesn't exist or at

5    least he thinks he saw, that this wasn't what was normally

6    used in terms of a "must see" or an "immediate see" patient.

7    I understand that.  I got that point.

8              MR. TYLER:  I have nothing further.

9              THE COURT:  Okay.  Do you have anything further?

10             MR. KATZ:  A few questions, your Honor.

11             THE COURT:  Go ahead.

12             MR. KATZ:  Thank you.

13                       REDIRECT EXAMINATION

14   BY MR. KATZ:

15   Q.     First of all, you understood that there was a request

16   for records from my office in April of 2008; correct?

17   A.     Yes.

18   Q.     Well, in fact, though, were you involved in the

19   copying of the records to Mr. Tyler's office when the lawsuit

20   was filed in 2009?

21   A.     Was I involved?  Did I copy the records myself?  No.

22   Q.     So did you give instructions that, when the lawsuit

23   was filed, to simply give them the same information they gave

24   Katz's office?

25   A.     I did not have any discussions with Mr. Tyler's office

1    that I can recall.  Ms. Lauria, as our custodian of

2    records/administrative assistant, knew that if there were

3    requests from records from Risk Management and UC Davis

4    and/or the law office of Toby Tyler, she was to give them

5    what they requested.

6    Q.      So there's no reason, but for knowing what's in the

7    file at the time she's making a copy of those records, why

8    she would in any way edit or redact or limit the information

9    given to them; correct?

10   A.      That's correct.

11   Q.      Now, going back briefly to blue page 4.  Do you have

12   that in front of you, sir?

13   A.      Yes.

14           THE COURT:  It's Court Exhibit 2.

15           MR. KATZ:  Court Exhibit 2.  Thank you, your Honor.

16   Q.      BY MR. KATZ:  And you've indicated that, from your

17   point of view, the most significant value of a CATS is

18   regarding client movement history; correct?  In other words,

19   showing hospitalizations?

20   A.      Diagnosis and movement history.

21   Q.      Those are the two important things; correct?

22   A.      Correct.

23   Q.      And then the last page in the JPS file is page 3 of

24   Court Exhibit 2; correct?

25   A.      Okay.  I'm confused.  Last page of what file?

1    Q.      Court Exhibit 2.

2    A.      Would that be the blue paper?

3    Q.      Yes.

4    A.      The blue paper is --

5    Q.      Page 3 of the CATS which matches up with 30026;

6    correct?

7            THE COURT:  It does.

8            THE WITNESS:  Yes.  Yes, I see it.

9    Q.      BY MR. KATZ:  And the last entry on that shows an

10   admission date of January 28, 2008; correct?

11   A.      Yes.

12   Q.      The SMHTC?

13   A.      I don't know if that's SMHTC.

14   Q.      Well, you'd certainly want to know when the person was

15   released and whether there was a subsequent hospitalization

16   prior to him going to jail, would you not?

17   A.      I don't know if that was SMHTC or not.

18   Q.      Well, you'd want to know, whatever the facility was,

19   when they were released; correct?

20   A.      If the clinician who is reviewing this is familiar

21   with the cost center code and knows that's a SMHTC code, then

22   they would be familiar with the admission date and discharge

23   date, yes.

24           THE COURT:  Shouldn't they know that?

25           THE WITNESS:  Shouldn't they know what?

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1         THE COURT:  That it's a SMHTC code?  Shouldn't they

2    know that this person on 1/27/08 was admitted, and there's a

3    code for that.  Shouldn't they know what those codes mean?

4    Weren't they trained to know that?

5         THE WITNESS:  They know the cost center code, your

6    Honor.  And if they don't have it memorized, they had a list

7    of cost center codes in their office.

8         THE COURT:  But wouldn't it be significant to know, if

9    you're the clinician, that this person was at SMHTC on

10   1/28/08 if that was the case?

11        THE WITNESS:  If that was SMHTC, yes.

12        THE COURT:  That would be significant information;

13   right?

14        THE WITNESS:  Yes.

15        THE COURT:  You'd want your clinician to know that?

16        THE WITNESS:  Yes, I would.

17        THE COURT:  I got your point, Mr. Katz.

18   Q.    BY MR. KATZ:  And on page 4 of Court Exhibit 2, that

19   shows when the person is discharged from the inpatient

20   facility, whether SMHTC or anywhere else.  That's an

21   important piece or a crucial piece of information, is it not?

22   A.    Yes.

23   Q.    And that's not in the JPS file, is it?

24        MR. TYLER:  What information?

25        THE COURT:  The information that the patient was

1   admitted on 1/28/08 and discharged on 1/28/08 from SMHTC.

2           MR. TYLER:  It is.  It's what I've pointed out to him

3   in the Severance intake summary that says that he was at a

4   psychiatric hospitalization, SMHTC, in January of '08.  Right

5   at the top of page 30079.  That was what I was trying to

6   develop from him, is that she had actually documented this

7   history.

8           THE WITNESS:  You asked me, your Honor, if that was

9   important, and I said yes, it was, when she had documented in

10  her note that one hospitalization.

11          THE COURT:  Okay.  So she knew that.

12          THE WITNESS:  Yes.

13  Q.      BY MR. KATZ:  And she knew that because she printed

14  out the CATS form that did not make it into this file which

15  is shown on page 4; correct?

16          MR. TYLER:  Well, that assumes fact not in evidence,

17  and it's got about three elements of being compound.

18          THE COURT:  Well, isn't Ms. Severance here?

19          MR. KATZ:  No, she's not.  She's not a defendant.

20          THE COURT:  Oh, that's right.  Okay.

21  Q.      BY MR. KATZ:  Did you understand my question, Doctor?

22  A.      No, I did not.

23          MR. KATZ:  Okay.

24          MR. TYLER:  I still have the same objection, by the

25  way.

1          THE COURT:  I didn't understand the question.  Ask the

2     question again.

3     Q.     BY MR. KATZ:  Sure.  So the CATS information that's in

4     the JPS file only shows an admission date of January 28,

5     2008; correct?

6     A.     No, that's not correct.  It shows a discharge date

7     also.

8     Q.     What page is the discharge date shown on the CATS

9     record?

10    A.     CATS page 4.  There's a discharge on the same date.

11    Q.     And that document is not in the JPS file, is it?

12    A.     No, it's not.

13    Q.     And you've seen, in the five years you've been at JPS,

14    enough to know --

15    A.     The five years, can I clarify?  Five years at the time

16    of this suicide.  I've been at JPS ten years now.

17         THE COURT:  Okay.  Five years at the time of the

18    suicide.  Go ahead.

19    Q.     BY MR. KATZ:  In the five years, you've seen enough

20    CATS to know that the only piece of paper that would show

21    that the original CATS is not in the file is because of the

22    information contained on page 4; correct?

23    A.     I don't understand your question.

24         THE COURT:  I don't either, Mr. Katz.

25    Q.     BY MR. KATZ:  Okay.  Page 4.

1          THE COURT:  Right.  I'm with you.

2          MR. KATZ:  Okay.  Shows two dates, your Honor, that

3     have relevance here.  Number one, it shows the admission

4     date.

5          THE COURT:  Right.  And the discharge date.

6          MR. KATZ:  Up to JPS of 3/13/08.  That would mean that

7     this would not be a part of the original file.  They couldn't

8     reproduce that, your Honor.  That's the problem.  In other

9     words, after he was admitted and seen by Ms. Severance --

10          THE COURT:  After the suicide.

11          MR. KATZ:  Right.  This could only have been done

12     after the suicide because when Ms. Severance saw him on the

13     13th, it would not be an entry for the 13th.

14          THE COURT:  Right.

15          MR. KATZ:  Her CATS would have ended on the discharge

16     of 1/28/08.

17          THE COURT:  Right.

18     Q.    BY MR. KATZ:  And there's no evidence in your records

19     of that part of the CATS printout; correct?

20     A.    Correct.

21          THE COURT:  I see.  Whatever Ms. Severance looked at

22     is not in the JPS file.

23          MR. KATZ:  Correct.  It's a different printout.

24          THE COURT:  Right.

25          MR. KATZ:  No more questions.

 1          MR. TYLER:  I'm sorry.  This just spins around.

 2          THE COURT:  The point is that the CATS printout that

 3     Ms. Severance looked at isn't in the JPS file.  Right?  Do

 4     you disagree with that?

 5          MR. TYLER:  Well, I mean you can look at 30026, and

 6     you can see that that is the same history he was just

 7     referring to, and it ends on 1/28/08, and it doesn't have any

 8     markings on it whatsoever.  So I don't know that it's clear

 9     that -- I mean the testimony has been that it looks like --

10     Tompkins talked about I wrote on what I had, and I wouldn't

11     have made two copies.  Somebody else made a copy is the

12     inference from that.  And here we have it shows this

13     admission date 1/28/08.

14          THE COURT:  It doesn't have a discharge date though.

15          MR. TYLER:  It has a pause.  And I don't know what's

16     on the next page.

17          THE COURT:  You're looking at 30026?

18          MR. TYLER:  Yes, I am.

19          THE COURT:  Okay.  So it isn't the same information.

20          MR. TYLER:  It isn't the same.  I mean it's either --

21     I mean Tompkins testified he did not print that out.  So it's

22     either Champeau or it's Severance.  But it definitely stops

23     there.  You're correct, it doesn't say "discharge," but it

24     says "admit."

25          THE COURT:  Again, these are part of the documents

1     that weren't produced initially.

2             MR. TYLER:  Yes.

3             MR. KATZ:  Correct.

4             MR. TYLER:  These documents were not produced to me

5     either, your Honor.

6             THE COURT:  I know.  It doesn't excuse the fact that

7     they weren't produced.

8             MR. TYLER:  Oh, no.

9             THE COURT:  Go ahead.  Any other questions for

10    Dr. Sokolov?

11    Q.      BY MR. KATZ:  I do have one question, Doctor.

12            When did you become aware of the Court's tentative

13    ruling on the motion in limine to exclude any reference to

14    the fact that the CATS documents had been in the file?

15            THE COURT:  I didn't issue that ruling until Thursday.

16            MR. KATZ:  That's right.  And these weren't revealed

17    to us until the afternoon following that, your Honor.

18            THE WITNESS:  Can I still answer his question?

19            MR. TYLER:  Yeah.  I know what the answer is going to

20    be because I know where he was.

21            THE COURT:  He was on vacation.

22            THE WITNESS:  Friday afternoon, I received an email

23    from Mr. Tyler.  I was out of the country but still checking

24    emails, unfortunately, on my vacation.  That's when I was

25    notified about this discrepancy in what was copied to both

1   counsel.

2           THE COURT:  Okay.  You may step down.

3           Any other witness you want to call?

4   MR. KATZ:  No.

5           THE COURT:  Mr. Tyler, anybody you want to call?

6   MR. TYLER:  No.

7           THE COURT:  All right.  Mr. Katz, the question is

8   what, if anything, are you asking the Court to do with

9   respect to this document fiasco?

10          MR. KATZ:  Well, it's not an easy question in part

11  because in this hearing, we learned still more about how it

12  pertains both to the liability of Tompkins as well as --

13  Dr. Tompkins, Mr. Hendricks, Dr. Sokolov, and Dr. Hales.  But

14  I think that this is truly a situation where some sort of

15  Rule 37 sanction is appropriate.

16          THE COURT:  You submitted a jury instruction that had

17  something to do with documents.  I'm looking for it.  Do you

18  know which one I'm talking about?

19          MR. KATZ:  I do.  It's a failure to explain.  I don't

20  believe that adequately deals with this situation, your

21  Honor.  I was deliberately not asking for an instruction

22  targeted at this until we had the hearing and until the Court

23  had the information.

24          THE COURT:  Instruction number 8 which is:  "If a

25  party fails to produce evidence which is under its control

1   and reasonably available to it and not reasonably available

2   to the adverse party, then you may infer that the evidence is

3   unfavorable to the party that could have produced it and did

4   not."

5          So other than give that instruction, what else do you

6   think the Court should do?

7          MR. KATZ:  I think in this instance, your Honor, the

8   Court should consider an issue instruction regarding the

9   supervisory claims against Hendricks and Sokolov, both of

10  whom had exclusive control of the file for four years.  It's

11  difficult to believe they don't know that they've only given

12  half the file.  I think the evidence is certainly clear that

13  someone --

14         THE COURT:  I'm going to stop you.  You withdrew the

15  failure to supervise claim.  That's not in this case.  It's

16  in the pretrial order.  You've abandoned that.

17         MR. KATZ:  The state claim, yes.

18         THE COURT:  The only claims are the de facto policy

19  claim against Sokolov, Hales, and Hendricks and the

20  ratification claim.

21         MR. KATZ:  Regarding the ratification claim, your

22  Honor, which is a form of supervisory liability, as the Court

23  knows --

24         THE COURT:  Well, the ratification really deals with

25  the post-suicide review and the failure to take any action

1    against -- I keep forgetting the nurse's name.

2              MR. KATZ:  Champeau, your Honor.

3              THE COURT:  Champeau and/or Dr. Tompkins.  Right?  I

4    mean that's the basis of the claim.

5              MR. KATZ:  Yes.  It seems to me, your Honor, that in

6    this case, what they've done is made it impossible, in

7    essence, to proceed with our experts because of their not

8    giving the information.  And I think circumstantially there's

9    more than enough for a reasonable fact finder to infer that

10   documents were removed from the file, that documents were put

11   into the file, the duplicate pages, the double hole punches.

12   There's no explanation for those things.  These two

13   individuals have testified they had exclusive control of the

14   file.  Dr. Sokolov was intimately involved in the litigation,

15   including attending expert depositions.

16              And we're put in a position that without a real

17   sanction, we have experts who spent God knows how much time

18   and money giving opinions based upon a particular similar set

19   of documents in the JPS file that should have been reviewed

20   and considered.

21              Similarly --

22              THE COURT:  Here's the question.

23              MR. KATZ:  Okay.

24              THE COURT:  If you were going to engage in that type

25   of conduct -- we discussed it a bit during the summary

1    judgment motions, and it's the issue I'm struggling with.  If

2    you're going to engage in that type of conduct, then you

3    either would have destroyed or put these documents that just

4    got produced in a file that no one could discover.  And so in

5    terms of nefarious behavior, I'm having a hard time reaching

6    that conclusion when the documents actually get produced.  I

7    mean they were still there.  They were still in the file.

8        And so the question is why produce them at this

9    point -- that's sort of question one -- other than I'm

10   concerned about this whole progress note issue.  And we'll

11   revisit that when we talk about motions in limine.  But you

12   wouldn't produce them.

13       And the second part of that is why would you give your

14   own lawyer only half the documents if you're trying to do

15   something as nefarious as you're implying?  That's what I'm

16   struggling with.  Because now you're putting both parties and

17   the person who is supposed to represent you in the dark.

18       MR. KATZ:  First of all, your Honor, we believe that

19   they did throw out a number of documents, including

20   Ms. Severance's progress note.  They eliminated from what was

21   ultimately given the CATS information that shows that they'd

22   been culling and cleaning the file.  They were put in a bad

23   situation, at some point they realized, because of the

24   evidence that we obtained from Tompkins' deposition, what he

25   had taken along with him and it wasn't on the program, and

1    the fact that there were documents that we had that we were

2    going to use that we obtained through Correctional Health

3    Services.  In other words, that's what they've called the

4    flimsy, that document.  So they know I had these documents.

5            Now, maybe if they had more time and they didn't have

6    the in limine motions, they would have done a better job of

7    doctoring it.  But the truth is the documents have clearly

8    been punched and removed, the ones that count, the ones that

9    Mr. Tyler told you are the significant ones.  Then we have

10   the fact that some of those we still don't have.  We know

11   it's not the same CATS that was in the file.  There's

12   unexplained extra copies.  We don't know how many notes are

13   missing.  All we know is this is what they've given us now.

14   I don't know how careful they've been about it, your Honor.

15   But I think it's clear that it has been monkeyed with.

16           And I think it's interesting that the documents we're

17   only getting now is post-summary judgment, post-in limine

18   rulings, which now they can safely -- someone might safely

19   believe Dr. Sokolov doesn't have to worry about what was said

20   to him.  So then all of a sudden these documents surface to

21   an extent.

22           And again, just looking at this, I think with some

23   degree of objectivity, maybe more than a share of scepticism,

24   but it's interesting that the part we don't get are notes

25   that reflect poorly on the person who has exclusive control

1     of the file, Dr. Sokolov and Mr. Hendricks.  Those are the

2     notes we don't get in advance.

3            So do I know why?  I mean maybe the fact that when

4     they gave us 54 pages, they were trapped into giving us those

5     pages because they hadn't thought it out more fully at that

6     point.  But I don't particularly say -- I don't say oh,

7     they've now been completely forthcoming.

8            THE COURT:  So why would they only give their own

9     lawyer half the file?

10            MR. KATZ:  Because they knew that -- well, maybe

11     because they thought their lawyer would do the right thing

12     and disclose that to the plaintiffs.  Maybe that's why, your

13     Honor, because they wanted to avoid their personal liability.

14            THE COURT:  No, no, no.  Originally they only gave

15     Mr. Tyler half the file.

16            MR. KATZ:  I don't know.  I'd be speculating, other

17     than the fact that they recognized the negative value of it.

18     And I'm not suggesting to the Court that Mr. Tyler is part of

19     their desire to suppress the evidence.

20            THE COURT:  Well, it's clearly not part of their

21     desire, and you can't go down that path.

22            MR. KATZ:  No.  So that's why they don't give it to

23     him.  If they give it to him, what's he going to do?  He's

24     going to give it to us.  Of course he is.  If they give it to

25     their lawyer, it's giving it to us.  That's why they don't do

1    it, your Honor.

2         THE COURT:  And so you think what Rule 37 sanction

3    would be appropriate, other than the jury instruction that

4    you submitted?

5         MR. KATZ:  Well, I think certainly, at a minimum, a

6    stronger jury instruction informing the jury that items have

7    been removed from the file and that they can infer what the

8    motive for that is and that those documents would have helped

9    the plaintiff in their claims regarding the ratification, at

10   a minimum.

11        Now, I think given Mr. Tompkins' testimony today, I

12   don't know if the documents we didn't receive -- we probably

13   have those now.  I think it puts his liability certainly in a

14   much -- much easier for us to show that liability at this

15   point.  But I believe regarding the ratification, I think

16   absolutely the jury should be told, at least as to Sokolov,

17   Dr. Sokolov and Mr. Hendricks, that the documents were

18   removed from the file they controlled, and the jury can infer

19   that those documents would have helped support the

20   plaintiffs' claim of ratification.

21        At a minimum, I think that would be a minimum for the

22   Court to do given what the Court's really heard here today,

23   your Honor.

24        THE COURT:  Mr. Tyler.

25        MR. TYLER:  Yes.  There's no showing that these items

1    were ever removed from the file.  What's been shown here is a

2    six-bit word, ineluctably.

3         Ms. Lauria --

4         THE COURT:  I mean it would make sense to me if only

5    the right side of the file had been copied.  But we know

6    that's not the case.  Some documents from the left were

7    copied and some documents from the right.  And playing

8    devil's advocate here, it seems inconsistent and not very

9    credible to me that an administrative assistant would make

10   that decision.  It just doesn't seem plausible to me that

11   someone like that, especially facing a subpoena from a lawyer

12   that everyone is aware of is likely to file a lawsuit, that

13   she would make those decisions.  That's where I'm having a

14   problem with at least your version of what happened here.

15        MR. TYLER:  Can I speak to that?

16        THE COURT:  Yeah.

17        MR. TYLER:  Thank you.  There is a pattern.  I mean

18   Mr. Katz is correct.  It's not only what's on the right side

19   of the file.  There are some documents on the left.  The

20   documents on the left that were copied by

21   Ms. Lauria and produced to Mr. Katz and to me are those

22   documents that were, in fact, generated by JPS clinicians,

23   with the exception of the one by Sami.  Here it is, 30018.

24   And I don't know why that didn't get copied to either Stewart

25   or myself.

 1            But what she's doing is she's taking this -- I mean

 2      it's the "Button-Down Mind Strikes Back."  She's saying:

 3      Notes recorded by a person who is a mental health

 4      professional documenting or analyzing the contents of what

 5      they're doing.  And then what she did is she went through

 6      this, she took our notes, she took the notes generated by JPS

 7      during the course of various things, and that's what she

 8      copied.  She didn't copy anything coming from a third party.

 9      She didn't copy these printouts which are essentially

10      third-party documentations, either the CATS or the JIMS, all

11      of those printouts.  And that's what she produced.  And she

12      produced that.  That's what she produced to me.  I had always

13      assumed that I had received a complete copy of the file, you

14      know, left side, right side, whatever.  And I mean these

15      documents help us.  I mean I was distraught on Thursday.

16      These documents actually help us.  I mean we killed some

17      trees talking about continuity of care and talking about CATS

18      printouts.  The CATS printouts are in here.  The continuity

19      of care, essentially his argument was going to be the left

20      hand doesn't know what the right hand is doing.  This fellow

21      comes back from UC Davis and nobody knows about the discharge

22      instructions and follow-up on that.  And I mean to say

23      that -- I mean we've just been going down this path

24      because --

25            THE COURT:  You're talking about the claim against

1    Mr. Tompkins?

2            MR. TYLER:  What about the claim against Mr. Tompkins?

3            THE COURT:  You're saying these documents help you?

4            MR. TYLER:  The claim against Mr. Tompkins?  No.  I'm

5    talking about the second cause of action where we're talking

6    about a de facto policy, a failure to obtain medical records.

7    And essentially it's a continuity of care issue.  The

8    continuity of care is demonstrated on page 30017.  I mean

9    that is a continuity of care document.  That shows the

10   transmission of information so that you do what's being

11   requested to address this person's perceived needs at the

12   time of discharge from UCDMC.

13           THE COURT:  You understand that claim's much more

14   than -- it's not that narrow of a claim.  It's a claim that

15   says there existed this policy which was de facto implemented

16   which allowed clinicians to go ahead and perform assessments

17   and evaluations without obtaining all the necessary medical

18   records even knowing that those records existed.

19           MR. TYLER:  I understand.

20           THE COURT:  And you think those documents help your

21   defense of that?

22           MR. TYLER:  Where he was going to go first and what

23   spurred my inquiry to --

24           THE COURT:  He knew as of March 5th that this guy's in

25   jail.  He knows he goes over to UC Davis Med Center.  He

1   doesn't do anything.  Then he knows he's back on March 10th.

2   He looked at another document.  He still doesn't get records

3   that he knows probably exist, and yet he goes by this guy's

4   cell and then makes an assessment that it's okay for him to

5   not go into -- and I'm simplifying it, but --

6          MR. TYLER:  Well, the documents --

7          THE COURT:  He didn't get the documents that he knew

8   about.  The big argument with respect to Dr. Tompkins is just

9   that.  He didn't get all the documents that a clinician

10  should get.  Then he does a 20-minute interview.  He doesn't

11  do a full suicide assessment.

12         MR. KATZ:  Two minutes.

13         THE COURT:  Two minutes.  Sorry.  And based on a

14  five -- I'll give him five minutes.

15         MR. TYLER:  Sure.

16         THE COURT:  He doesn't do a suicide assessment.

17         MR. TYLER:  Correct.

18         THE COURT:  He talked to the guy.

19         MR. TYLER:  Correct.

20         THE COURT:  Yet knowing what these documents show now

21  and knowing all that he knew about the guy already, he still

22  went by and talked to him for five minutes and then said he's

23  okay.

24         MR. TYLER:  This man had been seen by two providers in

25  the interim.  He had been seen by Ms. Severance on the 13th.

1    He had been seen by Ms. Champeau twice.

2              THE COURT:  Right.  The evidence showed he didn't

3    think Champeau's assessment was worth the piece of paper it

4    was written on.  That's the testimony.

5              MR. TYLER:  No, that's not.

6              THE COURT:  In the summary judgment, that was the

7    testimony.

8              MR. TYLER:  That was the assertion by them.  That was

9    the issue that they say that they want to go to trial on.

10             THE COURT:  He testified he had serious questions

11   about Champeau's assessment.  Right?

12             MR. TYLER:  No.  I don't remember that.

13             MR. KATZ:  The Court's correct.

14             THE COURT:  Yeah.  There's deposition testimony to

15   that effect.

16             MR. TYLER:  I don't remember that.

17             THE COURT:  Okay.

18             MR. TYLER:  Okay.

19             THE COURT:  Well, you're the one that's going to have

20   to deal with it.

21             MR. TYLER:  I will have to deal with it.

22             THE COURT:  The question is, Mr. Katz, you think that

23   it's still warranted that some instruction be given the

24   documents were removed.

25             MR. KATZ:  Yes, at a minimum.

1          THE COURT:  And I don't know that I can -- it's based

2    on circumstantial evidence.  There is no direct evidence of

3    that.  I know obviously the documents are in the file now.

4    They weren't copied for you.  I mean I can give that

5    instruction, a factual instruction.  But don't think I can,

6    and I don't think it's warranted, to actually conclude that

7    documents were removed.

8          MR. KATZ:  Well, I think certainly --

9          THE COURT:  If you want to draft an instruction.

10          MR. KATZ:  I would.  And I certainly believe that some

11    combination of the facts and giving the jury the opportunity

12    to assess the evidence and motives themselves would be

13    appropriate.

14          THE COURT:  You can argue all you want in closing

15    argument.

16          MR. KATZ:  And then the other issue, your Honor,

17    problem, with this new information is that the experts have

18    all been deposed and given reports, including a defense

19    expert who, in fact, relying in part upon the uncertainties

20    in the JPS file, said well, you couldn't jump to that

21    conclusion because there's really nothing in the file.  So

22    maybe she knew, maybe she didn't.  So at this point without a

23    curative instruction or determination under Rule 37 by the

24    Court, we would be prejudiced going to trial right now on

25    this new -- it lets them just reinvent the wheel again.

 1              THE COURT:  Well, here's the other question.  I assume

 2     your experts are now looking at these new documents.  And I

 3     don't know, do you have an expert on the deliberate

 4     indifference issue, for example?

 5              MR. KATZ:  Yes.

 6              THE COURT:  Okay.  And I assume your expert's going to

 7     have a slightly different opinion now that all these other

 8     documents have been produced and what you've heard here today

 9     from the witnesses; correct?

10              MR. KATZ:  I'm not the expert, but I would assume that

11     that would be something that any reasonable expert would take

12     into account, your Honor.

13              THE COURT:  And I assume Mr. Tyler's doing the same

14     with his experts; maybe not, maybe he is.  We now don't have

15     any idea necessarily what these experts may say.

16              So the question is do both sides want to continue this

17     trial to allow your experts time, allow your experts

18     additional time to review this new information and to, in

19     effect, disclose to each side so there's no surprises at

20     trial what their new opinion might be.

21              MR. GEORGE SR.:  Your Honor, can I speak to that?  Joe

22     George.

23              THE COURT:  Senior.

24              MR. GEORGE SR.:  Senior.

25              THE COURT:  I mean I can start you next Monday.  The

1    other trial I had scheduled this month, they just agreed to

2    continue it.  If both sides want four additional days this

3    week, I can start you next Monday.

4              MR. GEORGE SR.:  We are also obviously in a quandary

5    about where to go.  This is new evidence.  It hasn't been

6    chewed on by the experts.  Opinions haven't been granted.

7    And unless we're going to get some ruling outlined by

8    Mr. Katz, we would request a continuance in order to reopen

9    discovery at the defendants' expense.  We also think

10   sanctions are warranted, which I can address if you want me

11   to.

12             THE COURT:  Again, if you have to reopen discovery, I

13   think the appropriate sanction would be that the defense has

14   to pay the costs.

15             MR. GEORGE SR.:  Okay.

16             THE COURT:  What type of discovery are you talking

17   about and how long are you requesting?

18             MR. KATZ:  Your Honor, could we have a couple minutes'

19   break?  I'm getting a feeling of what the Court's proposing,

20   and I think just, in all candor, I think we should discuss

21   this because I know the Court's going to make some decisions.

22             THE COURT:  Right.  I think you need to discuss with

23   Mr. Tyler, too, as to what his view is and, Mr. Tyler, what

24   you plan, if anything, to do with respect to your experts.

25             MR. TYLER:  Well, it's not only the experts.  We have

1    some fairly -- I mean it's clear that --

2         THE COURT:  I'm sorry to interrupt.  I assume

3    someone's going to try to find this administrative assistant

4    as well.  And if you do, she's going to be deposed, although

5    we're five years down the road.

6         MR. GEORGE SR.:  We would also ask for, as part of an

7    ongoing discovery, that the Court order the defendant to

8    produce the personnel file of this employee who was

9    supposedly canned but not canned, as a start-off.

10        THE COURT:  Do you think she still works at UC Davis?

11        MR. GEORGE SR.:  Yes, we do.  She does.  We looked her

12   up yesterday on social media.  She's a UCDMC employee in

13   Rocklin.

14        THE COURT:  Okay.  Let's take ten minutes, and you can

15   discuss some of these issues.

16        MR. GEORGE SR.:  Thank you.

17        (Recess taken.)

18        THE COURT:  All right.  Back on the record.  Mr. Katz

19   and Mr. Tyler, what's your request?

20        MR. TYLER:  I defer to them.  I told him last week I'm

21   at your mercy.

22        THE COURT:  Okay.

23        MR. GEORGE SR.:  Well, your Honor, we had a

24   conversation outside amongst ourselves about who needs to be

25   deposed.  It's very unlikely that we would be able to get

 1    these things this week, unfortunately.

 2            THE COURT:  Okay.

 3            MR. GEORGE SR.:  So we would request then that

 4    discovery be reopened at defendants' expense, which would

 5    include bringing experts to Sacramento, all three experts.

 6    And basically that's it.  I mean we're at the Court's mercy

 7    in terms of the schedule.

 8            THE COURT:  And what about Ms. Lauria?

 9            MR. GEORGE SR.:  We have to have Ms. Lauria as well.

10    I'd ask the Court if it would direct the defendants to

11    produce the personnel file of Ms. Lauria, and we have to have

12    her deposed.  And additionally, the defendants themselves

13    will also be deposed.  Defendant Tompkins, defendant

14    Hendricks, defendant Dr. Sokolov, and, arguably, Dr. Hales,

15    perhaps not.  The problem with --

16            THE COURT:  Hang on.  Hang on.  One thing at a time.

17            MR. GEORGE SR.:  Okay.

18            THE COURT:  I will not and I cannot order them to

19    produce the personnel file for a number of reasons.  And

20    that's an issue I think will have to be briefed.  And maybe

21    you can cooperate and maybe, Mr. Tyler, you can make

22    arrangements to produce Ms. Lauria.  But again, I can't order

23    that because she's not a party, and she's not represented by

24    you.  But if you can work with them in terms of setting up

25    the deposition.  In terms of getting her personnel file,

1    you're going to have to, if you really want the entire

2    personnel file, that's a motion that, you know, you're going

3    to have to bring on an expedited basis, but that's a

4    discovery motion.  I'm going to let the magistrate judge take

5    care of that.

6             MR. GEORGE SR.:  Okay, your Honor.

7             MR. TYLER:  I would agree.  I mean she has privacy

8    rights, multiple layers of privacy rights.

9             THE COURT:  Right.

10            MR. TYLER:  I would just make the representation if,

11   in fact, she's within the UC Davis Health System, which would

12   be the medical group Rocklin office, I guess, one way or

13   another, I'll do my best to make it happen.

14            THE COURT:  Okay.

15            MR. TYLER:  And if, in fact, she's still an employee,

16   there's probably not a problem with that.

17            THE COURT:  And you're probably going to want to ask

18   her questions as well.  Maybe, maybe not.  I don't know.

19            MR. TYLER:  Well, I've got some questions.  I feel a

20   little hung out.  But I don't know that I need to -- my pique

21   is maybe not the proper subject of a deposition.

22            THE COURT:  Three experts.  Ms. Lauria.  And then you

23   started going into that you feel the need that you have to

24   re-depose all four defendants?

25            MR. GEORGE SR.:  Probably just three, your Honor.

1              THE COURT:  Okay.  Dr. Sokolov, Hendricks, and

2    Tompkins.

3              MR. GEORGE SR.:  Correct, your Honor.

4              THE COURT:  And I would probably put a limit on those

5    depositions since you got a lot of answers under oath today.

6              MR. GEORGE SR.:  Correct, your Honor.  We did.

7              THE COURT:  And I would expect that hopefully you

8    could get all three done in one day.

9              MR. GEORGE SR.:  I think that's reasonable, your

10   Honor.

11             MR. TYLER:  It depends on availability.  Dr. Tompkins

12   works for someone else now.

13             THE COURT:  By that, I meant no more than two and a

14   half hours per individual.

15             MR. TYLER:  Fair enough.

16             THE COURT:  And then Ms. Severance, did you say?

17             MR. KATZ:  No, we did not.

18             THE COURT:  Anyone else that you think you might have

19   to depose?

20             MR. GEORGE SR.:  I can't think of any.

21             THE COURT:  Okay.  And this will take some time.  So

22   it terms of bringing you back for trial, Mr. Vine.

23             THE CLERK:  Are we talking summertime?

24             THE COURT:  Summertime?

25             MR. TYLER:  Summertime.  And the only thing that I

 1    would ask you is please do not -- maybe I'm not in a position

 2    to say anything, but please do not set me between the 18th of

 3    June and the 7th of July.  I'm supposed to go on an

 4    unsupported bicycle ride from Mt. Rainier to Crater Lake.

 5              MR. GEORGE SR.:  Mid-July is -- well, your calendar

 6    dictates, your Honor.

 7              THE COURT:  I'm out the second week in July.

 8              THE CLERK:  We could go the 22nd or the 29th of July.

 9              THE COURT:  Does the 29th of July look okay?

10              MR. KATZ:  Okay by me.  I just don't know about the

11    experts' schedules, is the only thing that causes me any

12    concern.  But the 29th is good for me.

13              THE COURT:  As much as you're paying them, make them

14    available.

15              MR. TYLER:  I can't start on the 22nd exactly.

16              THE COURT:  29th.

17              MR. TYLER:  Oh, the 29th.  I'm sorry.

18              THE COURT:  All right.  The motion to continue the

19    trial is granted.  Trial and jury selection beginning

20    tomorrow is vacated.  We'll come back on July 29th for trial.

21    But I want a further pretrial conference with all of you.  So

22    early July.  Oh, Mr. Tyler is going to be gone.  How about

23    after July 7th.  What day is July 7th?

24              MR. TYLER:  That's a Sunday.  I mean that's when

25    I'm --

1          THE COURT:  What about the 10th of July, Mr. Vine?

2          THE CLERK:  It's a law and motion date.

3          THE COURT:  Let's do that.

4          THE CLERK:  We could do it at 11:00 o'clock on the

5     10th.

6          THE COURT:  I'm going to have a further pretrial with

7     you on July 10th, 2013.  That will start at 11:00.  Obviously

8     try to finish discovery by then.  And then I want to go

9     through at that point any additional exhibits you think you

10    might need to list, additional witnesses, and then any

11    further motions in limine, and then a review of the current

12    motions in limine in light of what's occurred.

13         All the tentative rulings are still only tentative.

14    In no way are they final.  And we're going to have to review

15    a lot of those.

16         MR. KATZ:  Your Honor.

17         THE COURT:  Yes.

18         MR. KATZ:  I think --

19         THE COURT:  I'm sorry to interrupt.  And then also it

20    would be helpful at that point, so we can talk about them at

21    the pretrial conference, any possible further jury

22    instructions that you think might be warranted.

23         MR. KATZ:  There are two other matters, your Honor.

24         THE COURT:  Go ahead.

25         MR. KATZ:  Number one, and I know it was discussed

1    this morning, the Court's summary judgment adjudication in

2    favor of Dr. Sokolov on his direct liability.

3         THE COURT:  I didn't hear anything this morning that

4    would change that decision.  I mean these documents were sort

5    of -- most of the documents go to the ratification claim as

6    opposed to the deliberate indifference claim.

7         MR. KATZ:  And then the other --

8         THE COURT:  It's a topic we can discuss at the

9    pretrial conference if you think you discover something more

10   now that discovery is reopened.

11        In terms of costs, obviously defendants will have to

12   pay for the deposition costs, including the costs of the

13   experts.  And I assume you're asking for your attorneys' fees

14   as well.

15        MR. GEORGE SR.:  Well, your Honor --

16        MR. KATZ:  Yes, your Honor.

17        MR. GEORGE SR.:  That was the short answer, your

18   Honor.

19        MR. KATZ:  And in particular, your Honor, quite

20   frankly, the time we spent on some of these motions in limine

21   regarding the CATS file that they're claiming is in the -- I

22   mean it's a little amazing to me that they bring a motion --

23        THE COURT:  Make that separate.

24        MR. KATZ:  Okay.

25        THE COURT:  Keep those types of fees separate from --

1    and I'll need to see a motion on that -- separate from any

2    fees that you incur not only for today.  So include fees for

3    today.  I assume you also had some preparation time for the

4    hearing today.  So from the time that you got these documents

5    until discovery closes, I want to take a look at the

6    attorneys' fees, and I'll consider including those as well.

7            MR. TYLER:  You want them to delineate what they are

8    and then submit it to you and then --

9            THE COURT:  Right.  Just as you would in a motion for

10   attorneys' fees, and I need the details, and I'll determine

11   what's reasonable and not reasonable.  I'm sure your hourly

12   rates are more than reasonable since we've gone as high as I

13   think $500 an hour now for lawyers from San Francisco.  I'm

14   not telling you that I would award $500 an hour, and I'm not

15   sure if that's what you bill, but I have seen motions asking

16   for $500 an hour.  But yeah, I want that kept separately in

17   terms of asking to be reimbursed.

18           All right.  So again, the dates are July 10th for the

19   pretrial at 11:00 a.m., July 29th at 9:00 a.m. for trial.

20           Anything else that we need to do today?  Yes?  No?

21   Hearing silence.  Thank you all.

22           Mr. Tyler, thank you for your immediate recognition of

23   this issue and coming forth and producing this.  I know this

24   wasn't easy for you today, and I appreciate your cooperation.

25           MR. TYLER:  Thursday was one of the worst days of my

1   professional life.

2          THE COURT:  And Mr. Katz and Mr. George, thank you for

3   your professionalism as well.

4          MR. GEORGE SR.:  Thank you, your Honor.

5          THE COURT:  All right.

6          MR. TYLER:  Thank you, your Honor.

7          (Proceedings concluded at 4:26 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above-entitled matter.

3

4

5                              /s/ Kelly O'Halloran

6                              KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25